THE O'MARA LAW FIRM, P.C.
DAVID C. O'MARA (Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
775/323-4082 (fax)
david@omaralaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Derivatively on Behalf of WYNN RESORTS, LIMITED,<br><br>Plaintiff,<br><br>vs.<br><br>J. EDWARD VIRTUE, CLARK T. RANDT, JR., ROBERT J. MILLER, RAY R. IRANI, D. BOONE WAYSON, JOHN J. HAGENBUCH, JAY L. JOHNSON, PATRICIA MULROY, ALVIN V. SHOEMAKER, MATT MADDOX, KIM SINATRA and STEPHEN A. WYNN,<br><br>Defendants,<br><br>– and –<br><br>WYNN RESORTS, LIMITED, a Nevada corporation,<br><br>Nominal Defendant. | No.<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, CORPORATE WASTE, UNJUST ENRICHMENT AND VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

DEMAND FOR JURY TRIAL

*It's now clear that the Wynn directors aren't just weak, they're downright awful.*

Joe Nocera, *Who's Going to Fix Wynn Resorts?  Not Its Board*, Bloomberg, Feb. 14, 2018.

Wynn Resorts Ltd.'s . . . board said it stopped an independent law-firm investigation into sexual-misconduct allegations against former Chairman and Chief Executive Steve Wynn, *even as pressure has mounted on directors to account for whether they failed to disclose information about his alleged conduct to regulators and investors.*

Chris Kirkham, et al., *Wynn Resorts Board Cancels Outside Investigation of Steve Wynn's Conduct*, Wall St. J., Feb. 12, 2018.

*The repercussions for the Wynn brand could cut far deeper and last far longer than they have for other companies that have faced harassment allegations in recent months, such as NBC, which fired Matt Lauer, and Fox, which let Bill O'Reilly go.*[1]

Janet Morrissey, *Steve Wynn's Tarnished Name and Now a Tainted Brand*, N.Y. Times, Feb. 11, 2018.

## INTRODUCTION

1.      This is a shareholder derivative action on behalf of nominal party Wynn Resorts, Limited ("Wynn" or the "Company") to hold its directors and top executives, including former Chairman and Chief Executive Officer ("CEO") Stephen A. Wynn ("Steve Wynn"), accountable for exposing the Company to billions of dollars in actual losses and risks of loss.[2] By as early as 2009, and by no later than 2015, defendants reportedly knew or should have known about the reportedly "decades-long pattern of sexual misconduct" by Steve Wynn, including one case that led to a $7.5 million settlement with a female Wynn employee.  But instead of disclosing this adverse material

---

[1]      Emphasis has been added throughout unless otherwise noted.

[2]      Defendants are Wynn's current directors – defendants  J. Edward Virtue ("Virtue"), Clark T. Randt, Jr. ("Randt"), Robert J. Miller ("Miller"), D. Boone Wayson ("Wayson"), John J. Hagenbuch ("Hagenbuch"), Jay L. Johnson ("Johnson"), Patricia Mulroy ("Mulroy"), and Alvin V. Shoemaker ("Shoemaker"); its former director – defendant Ray R. Irani ("Irani"); its President and CEO – Matt Maddox; its Executive Vice President, General Counsel and Secretary – Kim Sinatra; and its former Chairman and CEO – Steve Wynn (together, "defendants").

information, defendants, in breach of their fiduciary duties and related legal obligations, concealed the existence of the settlement and Steve Wynn's reported indiscretions from Wynn shareholders and, perhaps even worse, from the regulators responsible for licensing the Company's gaming operations.

2.      On January 26, 2018, *The Wall Street Journal* published an article entitled "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn." In the article, *The Wall Street Journal* said it had interviewed a number of women, many of whom were Steve Wynn's employees, who said the casino owner had forced them to have sex with him. *The Wall Street Journal* also reported that Steve Wynn paid a $7.5 million settlement to a manicurist at his hotel who said she was forced to lie down on a massage table and submit to having sex. A few days later, on February 5, 2018, *The Las Vegas Review-Journal* released a previously unpublished story from 20 years ago that reported similar allegations of sexual misconduct by Steve Wynn, including an account from a woman who said she was pressured to have sex with the casino owner in order to keep her job. Amidst these alarming revelations, *The Wall Street Journal* also reported that Steve Wynn created a limited liability company, called Entity Y, to hide the $7.5 million settlement with the Wynn employee who had accused him of sexual misconduct.

3.      When the public learned of defendant Steve Wynn's reported sexual harassment, the trading price of Wynn shares collapsed, falling to $162.92 per share on February 12, 2018, from $200.60 per share on January 25, 2018, or nearly 19%, wiping out more than $3.7 billion in once valuable shareholders' equity. Worse yet, gaming officials in Nevada, Massachusetts and Macau have opened investigations into the recently disclosed sexual harassment claims and $7.5 million settlement at Wynn.

4.     Moreover, despite defendant Steve Wynn's February 6, 2018 resignation, gaming officials in both Nevada and Massachusetts recently confirmed that their investigations will continue.  Reportedly, Wynn's regulators are keenly interested in the Board of Directors' and top executives' knowledge of the $7.5 million settlement and the circumstances surrounding its non-disclosure.  As the *Boston Globe* recently wrote:

> Steve Wynn is out as chief executive of Wynn Resorts Ltd.  But that doesn't end the questions for Massachusetts about what other Wynn executives or board members knew about a rash of sexual misconduct allegations against the casino mogul, including a $7.5 million settlement paid to a manicurist who said Wynn pressured her into having sex with him.
>
> Follow-up reporting by The Wall Street Journal, which first broke the news of Wynn's misconduct, suggests that the board's suitability needs serious scrutiny from gambling regulators charged with enforcing ethical standards in the state's gambling industry.  As the Journal reports, "The Wynn Resorts board has consistently received low marks for poor corporate governance issues and 'excessive' executive compensation policies.  Half of the independent directors have had seats for more than 10 years."
>
> *        *        *
>
> The Journal is also focusing on the possible complicity of Wynn executives when it comes to covering up for Wynn.  As the Journal points out, Matt Maddox – the Wynn Resorts president who replaced Wynn as CEO – and Kim Sinatra, the company's general counsel, were both at Wynn Resorts "when it applied for its Massachusetts gaming license and failed to disclose the $7.5 million settlement."  Both Maddox and Sinatra were investigated as "individual qualifiers" by the Massachusetts Gaming Commission.  That means their individual suitability is part of the overall suitability designation Wynn Resorts needed in order to get the license to build a casino in Everett.

*Problems with Wynn casino go deeper than the man*, Boston Globe, Feb. 10, 2018.

5.     And as *Bloomberg* wrote in a February 14, 2018 article describing the Wynn Board's governing capacity as "awful" and detailing its history of favoring defendant Steve Wynn over his former business allies and Wynn shareholders:

> ***Is there a corporate board in the U.S. worse than the one at Wynn Resorts Ltd.?***

It took two weeks for chairman and chief executive Steve Wynn to step down as a series of exposes about his alleged sexual behavior piled up. The board could've forced the issue sooner, I argued last week, but they were far too deferential to the co-founder of the company, someone with significant ties to many of them.

. . . ***It's now clear that the Wynn directors aren't just weak, they're downright awful.*** Under the circumstances, the directors are making the biggest possible mistake: placing the interests of an executive over that of shareholders.

*       *       *

The Friday before Wynn resigned, the board had taken a step straight out of the corporate crisis playbook: It hired an outside law firm to conduct an independent inquiry. The firm, O'Melveny & Myers, said it was establishing a telephone hotline and a website where current and former Wynn Resorts employees could report instances of sexual harassment by Wynn, according to the Wall Street Journal.

***No sooner had Wynn stepped down than the board canceled the outside investigation, switching gears to its own internal investigation.*** And who did they name as the head of the "special committee" overseeing this internal investigation – including the allegation that Wynn paid a $7.5 million settlement to an ex-employee he had forced to have sex with him? Patricia Mulroy, a member of the board who dealt with Wynn for decades as a Nevada state regulator.

*       *       *

***In circling the wagons around Steve Wynn, the Wynn Resorts board is playing a dangerous game.*** Gambling is a highly regulated industry that puts a premium on the integrity of gaming operators. ***Regulators in Nevada, Macau and Massachusetts are all doing their own investigations into Steve Wynn and the company. They are not going to look kindly on the board's decision to kill the O'Melveny investigation.***

*       *       *

***As difficult as it may be for individual directors, they need to finally turn their back on their former leader and start protecting the company.***

Joe Nocera, *Who's Going to Fix Wynn Resorts? Not Its Board*, Bloomberg, Feb. 14, 2018.

6.     As a result of these adverse developments, whether the Company ultimately will receive approval to operate its new $2.5 billion Boston Harbor Wynn Resort, which is already under construction, is unclear.

- 4 -

7.    Although new and deeply troubling to the public once disclosed, defendant Steve Wynn's reported "pattern of sexual misconduct" – in particular, the $7.5 million settlement – was known internally for some time by Wynn's top insiders, including members of its Board of Directors (the "Board"). Defendants' fiduciary obligations should have compelled them to disclose the circumstances surrounding defendant Steve Wynn's reported sexual harassment, especially the $7.5 million settlement. As Yale School of Management Professor Jeffrey Sonnenfeld, an expert on corporate governance, recently explained:

> "It should have been disclosed . . . . It's not just his choice, his decision, but also his name and even his signature, so it's hard to disentangle the value of his personal conduct and image with the brand value."

Alexandra Olson and Marley Jay, *Wynn case raised questions about responsibility to investors*, Assoc. Press, Feb. 7, 2018. But defendants did not make such disclosures.

8.    Instead, over a period of years, defendants caused Wynn to issue public reports to shareholders and gaming regulators alike that concealed adverse material information about the Company's namesake, defendant Steve Wynn. Defendants' false and misleading statements and material omissions breached their fiduciary duties and related legal obligations. They also have now exposed Wynn to billions of dollars in losses and risks of loss.

9.    However, defendants have not fared nearly so badly. Since 2009, and in some cases 2013, defendants have collectively pocketed more than $453.1 million from Wynn in trading proceeds and compensation not justified in light of the recently disclosed facts regarding their handling of the sexual harassment settlement and claims surrounding defendant Steve Wynn. These payments unjustly enriched defendants at the Company's expense.

10.    Nevertheless, the Board has not – and will not – commence suit against defendants for breach of fiduciary duty, corporate waste, unjust enrichment and/or violations of the federal

securities laws, let alone vigorously prosecute such claims. Point in fact, just weeks after announcing its own investigation, the Board, on February 9, 2018, shuttered its investigation into Steve Wynn's reported sexual harassment – conveniently also ending a formal inquiry into its members' own knowledge of and/or complicity in the non-disclosure of Steve Wynn's reported "decades-long pattern of sexual misconduct" and/or the $7.5 million settlement. *See* Chris Kirkham, *Wynn Resorts Board Cancels Outside Investigation of Steve Wynn's Conduct*, Wall St. J., Feb. 12, 2018. While the Board has reportedly reinitiated the investigation, it did so by hiring "a new law firm with longstanding connections to the casino company." *See* Chris Kirkham, et al., *Wynn Resorts Board Hires New Law Firm to Run Investigation of Ex-CEO Steve Wynn*, Wall St. J., Feb. 13, 2018.

11.　　By this action, plaintiff seeks to vindicate Wynn's rights against its wayward fiduciaries.

## JURISDICTION AND VENUE

12.　　The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, corporate waste and unjust enrichment. In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the U.S. mail and the facilities of the national securities markets.

13.　　This Court has subject matter jurisdiction under §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331. This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367. This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has personal jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) Wynn maintains its principal place of business in this District; (ii) one or more of the defendants either reside in or maintain executive offices in this District; and (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

## THE PARTIES

**Plaintiffs**

16.     Plaintiff City of Dearborn Heights Act 345 Police & Fire Retirement System is and has continuously been a shareholder of Wynn since March 2017.

**Nominal Party**

17.     Nominal party Wynn is a Nevada corporation with its principal offices located at 3131 Las Vegas Boulevard South, Las Vegas, Nevada 81909.  Wynn is a developer, owner and operator of destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters and large meeting complexes.

18.     The Company owns approximately 72% of Wynn Macau, Limited ("WML") and operates two integrated resorts in the Macau Special Administrative Region of the People's Republic of China ("Macau"), Wynn Macau and Wynn Palace.  Wynn also owns 100% of and operates Wynn

- 7 -

Las Vegas, an integrated resort in Las Vegas, Nevada, and is currently constructing Wynn Boston Harbor, an integrated resort in Everett, Massachusetts, adjacent to Boston, which it expects to open in mid-2019.

19.     Wynn shares trade on the NASDAQ Global Select Market under the symbol "WYNN." Upon disclosure of Steve Wynn's reported sexual harassment, the value of Wynn collapsed by over $3.7 billion, as its share price declined to $162.92 per share on February 12, 2018 from $200.60 per share on January 25, 2018.

**Directors Defendants**

20.     Defendant Virtue has served as a director of Wynn since November 2012. He has also served on the Compensation and Corporate Governance Committees of the Board. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Virtue "has extensive financial experience as a fund manager and business investor, including experience in the gaming, hospitality and consumer products industries," which enable Wynn to meet "[t]he continuing challenges of the global economic environment [that] require sophisticated and diverse experience in capital markets." Virtue received at least $1,506,683 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship.

21.     Defendant Randt has been a director of Wynn since October 2015. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Randt's "fluency in Mandarin Chinese and extensive China experience make him well-suited to meaningfully contribute to the Board's oversight of the Company's operations in Macau." Randt received at least $564,545 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship. Additionally, while Wynn shares were

trading at artificially inflated prices, Randt sold 3,000 shares of Wynn stock for insider trading proceeds of $387,000.

22.     Defendant Miller has been a director of Wynn since October 2002.  He has also served on the Audit, Compliance and Corporate Governance Committees of the Board.  Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Miller's "legal background and knowledge of Nevada gaming regulation support his service as Chairman of the Company's Compliance Committee, which role is important in maintaining [Wynn's] regulatory structure and probity." Miller received at least $1,989,877 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship.  Additionally, while Wynn shares were trading at artificially inflated prices, Miller sold 15,000 shares of Wynn stock for insider trading proceeds of $2,839,155.

23.     Defendant Irani served as a director of Wynn from October 2007 to March 2018.  He has also served on the Corporate Governance Committee of the Board.  Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, "the Company continues to benefit from [defendant Irani's] extensive international business experience."  Irani received at least $1,459,504 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship.

24.     Defendant Wayson has been a director of Wynn since August 2003.  He has also served on the Audit and Corporate Governance Committees of the Board.  Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Wayson "has extensive operational experience in the casino finance and marketing areas, beginning as casino controller and ultimately managing a resort casino property in Atlantic City, N.J.," and, as a result, "[t]he Board benefits from Mr. Wayson's first-hand experience in operations and utilizes his

knowledge of the business, especially in the finance, gaming and marketing areas, to identify, manage and monitor risk." Wayson received at least $1,548,127 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Wayson sold 37,500 shares of Wynn stock for insider trading proceeds of $3,267,000.

25.     Defendant Hagenbuch has been a director of Wynn since December 2012. He has also served on the Audit and Compensation Committees of the Board. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Hagenbuch "brings to our Board deep corporate strategy and financial expertise gained over thirty years as a private equity investor and as a director of both public and private companies." Hagenbuch received at least $1,527,433 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship.

26.     Defendant Johnson has been a director of Wynn since August 2016. He has also served on the Compensation Committee of the Board. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Johnson's "experience as an executive and director of various public companies contributes to the Board's ability to guide corporate strategy and oversee public company governance," and, coupled with his 32-years of military service, "provides valuable public policy and government relations experience as well as extensive leadership and strategic skills." Johnson received at least $380,935 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship.

27.     Defendant Patricia Mulroy has been a director of Wynn since October 2015. She has also served on the Compliance and Corporate Governance Committees of the Board. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board,

defendant Mulroy's "experience on the Nevada Gaming Commission brings experience and insight into state regulatory and public policy issues impacting the Company's operations." Mulroy received at least $617,577 in fees, stock awards and other compensation not justified by the Company's performance while under her stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Mulroy sold 2,226 shares of Wynn stock for insider trading proceeds of $285,106.

28.    Defendant Shoemaker has been a director of Wynn since December 2002. He has also served on the Audit and Compensation Committees of the Board. Despite the handling of the harassment allegations surrounding Steve Wynn, in the judgment of the Board, defendant Shoemaker's "deep experience as a financial executive serving as the Chairman of First Boston contributes to the Board's oversight of the Company's financial matters." Shoemaker received at least $1,508,877 in fees, stock awards and other compensation not justified by the Company's performance while under his stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Shoemaker sold 40,000 shares of Wynn stock for insider trading proceeds of $6,717,573.

**Officer Defendants**

29.    Defendant Maddox has been President of Wynn since November 2013. Since joining Wynn in 2002, he has also served as Chief Financial Officer, Senior Vice President of Business Development and Treasurer of the Company. On February 6, 2018, Maddox became CEO of Wynn, replacing Steve Wynn. Maddox received at least $18.5 million in salary, stock awards and other compensation not justified by the Company's performance while under his stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Maddox sold 451,757 shares of Wynn stock for insider trading proceeds of $58,928,843.

30.      Defendant Sinatra has been Executive Vice President, General Counsel and Secretary of Wynn since February 2006. Sinatra received at least $11.8 million in salary, stock awards and other compensation not justified by the Company's performance while under her stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Sinatra sold 231,735 shares of Wynn stock for insider trading proceeds of $27,874,815.

31.      Defendant Stephen A. Wynn ("Steve Wynn") served as Chairman and CEO of the Company from 2002 to February 6, 2018. According to the Board, "Mr. Wynn's over 47 years of experience in the industry have contributed to his brand name status as the preeminent designer, developer and operator of destination casino resorts. Mr. Wynn's involvement with our casino resorts provides a distinct advantage over other gaming enterprises." Steve Wynn received at least $94 million in salary, stock awards and other compensation not justified by the Company's performance while under his stewardship. Additionally, while Wynn shares were trading at artificially inflated prices, Steve Wynn sold 3,000,000 shares of Wynn stock for insider trading proceeds of $217,319,004.

## THE FIDUCIARY DUTIES OF WYNN'S DIRECTORS AND OFFICERS

32.      By reason of their positions as Wynn's directors and/or officers and because of their ability to direct and control the Company's business and corporate affairs, the defendants owed Wynn and its shareholders a fiduciary duty to use their utmost ability to control and manage Wynn in an honest and lawful manner. Toward that end, Wynn's directors and officers owed the Company and its shareholders fiduciary duties to exercise good faith and loyal and reasonable supervision over the Company's management, policies, practices and internal controls.

33.      More specifically, as Wynn's directors and officers, defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal

obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to lawfully maximize the value of the Company's shares; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how Wynn conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the securities laws; (v) ensure that Wynn was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the anti-discrimination and sexual harassment laws; and (vi) refrain from breaching their fiduciary duties to the Company by adopting practices, procedures and controls inconsistent with their fiduciary duties of care, good faith and loyalty.

34.     The four-person Audit Committee of the Board is primarily responsible for, among other things, "overseeing the Company's compliance program with respect to legal and regulatory compliance, and the Company's policies and procedures for monitoring compliance." Additionally, the Audit Committee is responsible for "meeting periodically with management to review the Company's major risk exposures and the steps management has taken to monitor and control such exposures." Additionally, the Audit Committee Charter provides, in relevant part, that its members shall "[m]eet periodically with the Disclosure Committee (and quarterly with its chairman) to discuss compliance by the Corporation with legal and regulatory requirements relating to the Corporation's

- 13 -

financial statements, and receive reports from management regarding, and review and discuss the adequacy and effectiveness of, the Corporation's disclosure controls and procedures."

35.    As such, defendants Hagenbuch, Miller, Shoemaker and Wayson, as well as their co-directors, were in a position to know of defendant Steve Wynn's reported sexual harassment of Wynn's female employees. Instead of disclosing defendant Steve Wynn's indiscretions, however, defendants did nothing. Instead, they allowed defendant Steve Wynn to retain his positions of power and prestige at Wynn, with disastrous consequences for the Company. The five-person Nominating and Corporate Governance Committee of the Wynn Board is primarily responsible for, among other things, "developing and recommending to the Board a set of corporate governance guidelines applicable to the Company and overseeing corporate governance matters generally." Within this portfolio of duties, defendants Irani, Miller, Mulroy, Wayson and Virtue, and each of them, were responsible, in whole or in part, for oversight of Wynn's compliance with federal and state laws, including the Civil Rights Act of 1965 and parallel state laws prohibiting discrimination against women in general and against women in the workplace in particular.

36.    Sexual harassment in the workplace is a form of discrimination. Despite their duty to create a harassment-free workplace, defendants Irani, Miller, Mulroy, Wayson and Virtue were unable to create such an environment at Wynn, including at the highest levels of the Company. Instead, defendant Steve Wynn, the Chairman and CEO, reportedly was able to harass female Wynn employees for years, with dire consequences for the Company once disclosed

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

37.    In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design. In addition to the wrongful conduct complained of herein giving rise to

- 14 -

primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

38.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

39.     Wynn develops, owns and operates multiple destination casino resorts that integrate hotel accommodations and a wide range of amenities, including fine dining outlets, premium retail offerings, distinctive entertainment theaters and large meeting complexes.

40.     Defendants are Wynn's current and former directors and top executives. As Wynn's corporate fiduciaries, they owed the Company fiduciary duties of care, good faith and loyalty – the highest duties known to the law. These fiduciary duties required defendants to, among other things, protect and preserve Wynn's valuable corporate assets, including its brand, reputation and goodwill. Additionally, defendants owed Wynn and its shareholders, as well as the regulators and the public, an obligation to speak the entire truth when they chose to say anything about Wynn's business, finances and prospects for future growth.

41.     Defendants breached these fiduciary duties, however. By 2016, defendants reportedly knew or should have known about defendant Steve Wynn's reported "pattern of sexual misconduct," including about the $7.5 million settlement with a former Wynn employee. Yet defendants failed to disclose this adverse material information regarding Steve Wynn, with disastrous results for the Company.

42.     More particularly, on January 26, 2018, *The Wall Street Journal* reported on a

"decades-long pattern of sexual misconduct" by Steve Wynn, Wynn's former Chairman and CEO.

After interviewing more than 150 sources for the article, *The Wall Street Journal* wrote:

> Not long after the billionaire casino mogul Steve Wynn opened his flagship Wynn Las Vegas in 2005, a manicurist who worked there arrived at the on-site salon visibly distressed following an appointment in Mr. Wynn's office.
>
> Sobbing, she told a colleague Mr. Wynn had forced her to have sex, and she repeated that to others later.
>
> After she gave Mr. Wynn a manicure, she said, he pressured her to take her clothes off and told her to lie on the massage table he kept in his office suite, according to people she gave the account to. The manicurist said she told Mr. Wynn she didn't want to have sex and was married, but he persisted in his demands that she do so, and ultimately she did disrobe and they had sex, the people remember her saying.
>
> After being told of the allegations, the woman's supervisor said she filed a detailed report to the casino's human-resources department recounting the episode.
>
> Mr. Wynn later paid the manicurist a $7.5 million settlement, according to people familiar with the matter.
>
> The incident was referenced, in broad terms, in a lawsuit in which Mr. Wynn's ex-wife, Elaine Wynn, seeks to lift restrictions on the sale of her stock in Wynn Resorts Ltd. Attorneys for Mr. Wynn in a court filing admitted he made the personal payment; in a later hearing, his corporate attorney said there had been "allegations of assault." Court records in the suit are heavily redacted. Specifics of the allegation and the size of the settlement haven't been previously reported.
>
> *             *             *
>
> Beyond this incident, dozens of people The Wall Street Journal interviewed who have worked at Mr. Wynn's casinos told of behavior that cumulatively would amount to a decades-long pattern of sexual misconduct by Mr. Wynn. Some described him pressuring employees to perform sex acts.

43.     Describing some of the other incidents of sexual indiscretion towards female Wynn

employees, *The Wall Street Journal* article continued:

> Mr. Wynn is a regular on his casino floors, known for a keen attention to details and what employees say is a temper that can flare when they fall short. He

has frequently had services such as manicures, massages and makeup application performed in his on-site office at the Wynn Las Vegas.

The contrast between Mr. Wynn's position and that of the salon and spa employees is stark. Former employees said their awareness of Mr. Wynn's power in Las Vegas, combined with the knowledge that the jobs they held were among the best-paying available there, added up to a feeling of dependence and intimidation when Mr. Wynn made requests of them.

Some said that feeling was heightened at times by the presence in a confined office space of one or more of his German shepherds, trained to respond to commands in German

The Journal contacted more than 150 people who work or had worked for Mr. Wynn; none reached out to the Journal on their own. Most of those who spoke to the Journal about Mr. Wynn said they worried that doing so could hurt their ability to work elsewhere because of his influence in the casino industry and the state.

Former employees said they sometimes entered fake appointments in the books to help other female workers get around a request for services in Mr. Wynn's office or arranged for others to pose as assistants so they wouldn't be alone with him. They told of female employees hiding in the bathroom or back rooms when they learned he was on the way to the salon.

"Everybody was petrified," said Jorgen Nielsen, a former artistic director at the salon. Mr. Nielsen said he and others repeatedly told high-level company executives Mr. Wynn's sexual advances were causing a problem, but "nobody was there to help us."

One former massage therapist at the Wynn Las Vegas spa said that several years ago, when Mr. Wynn was booking multiple appointments a week with her in the private massage room in his office suite, he would continually adjust a towel to expose himself. Then at one session, she said, he threw it off and said, "Just get this thing off of me."

She said he wouldn't let her use a towel to cover his genitals after that, contrary to state licensing regulations, and he also began rubbing her leg while she massaged him.

After a few weeks, the former employee said, Mr. Wynn instructed her to massage his penis to climax. The woman said that because he was her boss, she felt she had no choice but to agree to some of Mr. Wynn's requests, including that one. She said masturbating him became a frequent part of the massage sessions for several months.

At the end of each hour-long massage session, she said, he handed her $1,000 in cash, which was the same amount as before the sexual activity began.

In subsequent sessions, the woman said, Mr. Wynn asked her to perform oral sex on him and described in detail how he wanted it done. This request she refused, she said.

The woman said she told Mr. Wynn at a later session she was uncomfortable with his requests, and he then stopped asking for massages from her.

She said she didn't tell anyone what happened at the time because she was embarrassed, adding she is still trying to deal with the incident emotionally. She did tell a colleague in a general way that Mr. Wynn had been inappropriate with her, that colleague recalled in an interview.

The colleague said she offered advice to the massage therapist – but didn't mention that Mr. Wynn had also made advances toward her while she massaged him in his office's private massage room. The colleague said in an interview Mr. Wynn would remove his towel and, while she massaged the front of his thighs, would tell her to "go higher," which she understood to mean touch his genitals. She said she told him this made her uncomfortable, and then his requests for massages became less frequent.

44.     Continuing with additional examples of defendant Steve Wynn's reported pattern of

sexual harassment during his reign at Wynn, *The Wall Street Journal* article stated:

Shawn Cardinal, who was a personal assistant to Elaine Wynn while she was married to Mr. Wynn, said that around 1987, Mr. Wynn repeatedly asked her to spend time with him outside of work. She said he continued asking, often approaching her at her desk outside his wife's office, despite her telling him she had plans with her husband and child.

On the phone, he would ask, "What are you wearing? Why don't you hang out with me after work?" said Ms. Cardinal. "I was not brave enough to say, 'How dare you?' I just joked my way out of it and I made sure I was never alone with him."

Several former employees said Mr. Wynn often walked around some areas of the complex in extremely short shorts without underwear, and he would sit in the salon to get pedicures in such a way that his genitals were exposed.

One former employee said after she had performed services in Mr. Wynn's office for years, one day he asked if he could kiss her. She said she laughed off the request, hoping to leave without upsetting him.

Another time, this employee said, she was performing services in her own workplace at the casino when Mr. Wynn said, "So when are you going to come into my office and f— me?"

She said that she again laughed off the proposition. "I would say, 'Oh Mr. Wynn[,]'" she recalled. "I was just trying to get on with my job."

One time as she did her work in Mr. Wynn's office, this woman said, he repeatedly rubbed his genitals, which were falling out of his shorts, and made comments about things he would like to do with her sexually. On one occasion as she was leaving his office, the former employee said, Mr. Wynn grabbed her waist as she stood against a wall and told her to kiss him. She said she slipped out of his hold and left.

After around two weeks of pursuit, this woman said, Mr. Wynn stopped.

The former employee's supervisor and another colleague confirmed being told of these advances in detail at the time. The employee and the supervisor said they sought to manage the situation rather than report it because they believed there would be repercussions if they did.

The 2005 allegations of the manicurist that led to the settlement were the most striking described by former employees. In this instance, a woman who was a salon manager at the time said she filed a written report to human resources. She said she got a call from an executive, Doreen Whennen, castigating her for filing to HR and saying she should have taken the matter directly to Ms. Whennen.

The former manager said no one followed up with her about the matter. The manicurist soon left.

45.     The market's reaction to these ghastly revelations was fast and furious. On January 26, 2018, the trading price of Wynn shares collapsed by $20.31 per share, or 10%, wiping out more than $2.08 billion in shareholders' equity. During the next two weeks, Wynn shares continued to plummet, falling to $162.92 per share on February 12, 2018, wiping out an additional $1.7 billion in once valuable shareholders' equity. Since the January 26, 2018 disclosures about Steve Wynn's reported sexual harassment and $7.5 million settlement, Wynn has shed over $3.7 billion in value, and is at risk for further precipitous declines in its market capitalization.

46.     Worse yet, upon learning of Steve Wynn's reported decades of sexual harassment, the Nevada Gaming Control Board opened an investigation into Wynn. In a statement released on January 30, 2018, the powerful Nevada gaming authority wrote:

> "After completing our review the Nevada Gaming Control Board is conducting an investigation with regard to the allegations of sexual misconduct involving Steve Wynn . . . . The Nevada Gaming Control Board will conduct its investigation in a thorough and judicious manner."

47.     Similarly, on January 31, 2018, the Massachusetts Gaming Commission, stunned by the sexual harassment allegations at Wynn, announced its intention to conduct an investigation into defendant Steve Wynn and the Company's high-ranking officers and directors.

48.     Inside Wynn, however, defendant Steve Wynn's reported "pattern of sexual misconduct" in general, and the $7.5 million settlement in particular, were known to the Company's top insiders, including the members of the Board. Defendants' fiduciary obligations compelled them to disclose the circumstances surrounding defendant Steve Wynn's reported sexual harassment, especially the $7.5 million settlement.   As Yale School of Management Professor Jeffrey Sonnenfeld, an expert on corporate governance, recently explained:

> "It should have been disclosed . . . . "It's not just his choice, his decision, but also his name and even his signature, so it's hard to disentangle the value of his personal conduct and image with the brand value."

Alexandra Olson and Marley Jay, *Wynn case raised questions about responsibility to investors*, Assoc. Press, Feb. 7, 2018.  But defendants did not disclose it.

49.     Instead, over a period of years, defendants caused Wynn to issue public reports to shareholders and gaming regulators alike that concealed adverse material information about defendant Steve Wynn's reported harassment of Wynn's female employees. Defendants' false and misleading statements and material omissions breached their fiduciary duties and related legal obligations.  They also have now exposed Wynn to billions of dollars in losses and risks of loss.

50.     Under different circumstances, defendants may have been at liberty to not disclose personal information about a high-level executive.  However, this is not that situation.  Defendant Steve Wynn is an integral part of the Wynn enterprise, and making disclosure of adverse material

information about him is essential. This includes difficult subject matter, such as defendant Steve

Wynn's reported "pattern of sexual misconduct," including one case that led to a $7.5 million

settlement.

51.     Defendant Steve Wynn's name and signature adorn every Wynn resort that the

Company owns. He is synonymous with the Wynn brand itself, a fact recognized numerous times

by defendants in the Company's shareholder reports. For example, in Wynn's 2016 Annual Report

on SEC Form 10-K, addressing contingent risks associated with the Company's forward-looking

statements, defendants acknowledged that Wynn's "dependence on Stephen A. Wynn" "could cause

actual results to differ materially from those we express in these forward-looking statements."

Likewise, in the Risk Disclosure section of the same Annual Report, defendants admitted that "[t]he

loss of Stephen A. Wynn could significantly harm our business," stating:

> Our ability to maintain our competitive position is dependent to a large
> degree on the efforts, skills and reputation of Stephen A. Wynn, the Chairman of the
> Board, Chief Executive Officer and one of the principal stockholders of Wynn
> Resorts. Mr. Wynn's employment agreement expires in October 2022; however, we
> cannot assure you that Mr. Wynn will remain with Wynn Resorts. *If we lose the
> services of Mr. Wynn, or if he is unable to devote sufficient attention to our
> operations for any other reason, our business may be significantly impaired.*

52.     The importance of defendant Steve Wynn to the Wynn brand, and the Company's

ultimate financial success, is also illustrated in securities analysts reports on the Company. For

example, in a January 29, 2018 report, Deutsche Bank analysts Carlo Santarelli and Danny Velloy

wrote:

### What Does Steve Wynn Mean to WYNN / Wynn Resorts

> From an investment perspective, we contemplate the value cash flows, asset
> quality, and asset positioning, amongst other considerations. In the case of WYNN
> specifically, we do believe Mr. Wynn's influence, most notably in the development
> and design phases of the iconic buildings, and the way they are managed and
> maintained, directly impacts the majority of the aforementioned valuation
> considerations. Accordingly, we believe his influence on operations, the brand, and

the investment community, is more pronounced than that of the majority of his peers. ***Thus, hypothetically, if Mr. Wynn were to step down, something we aren't about to speculate on, we do believe there would be an impact, over time, on the operations of the Company and we believe the design and development of future Company projects would lack the meticulous attention to detail the current portfolio is renowned for.*** On the latter point around development, we believe these project nuances have paved the way Mr. Wynn's properties to consistently garner meaningful fair share performance in nearly every competitive market Mr. Wynn has entered.

53.     Similarly, in a January 29, 2018 report, JP Morgan analyst Joseph Greff more bluntly

wrote:

- ***A scenario where WYNN doesn't have Steve as a CEO is not good for the company.*** We have always held the belief that WYNN possesses the single largest individual CEO dependency versus any of the other 30 gaming and lodging companies [in] our coverage universe (well, maybe LVS with CEO Sheldon Adelson is tie with WYNN). We also have always held the belief that Steve Wynn, given his long history of creating shareholder value going back to his Mirage Resorts days, has received a premium multiple for his hands-on involvement. ***A WYNN without Steve likely sees some valuation multiple contraction, and obviously, some of this was factored into the stock price on Friday.***

54.     Further, in a January 29, 2018 report, Jefferies analyst David Katz, confirming the

centrality of defendant Steve Wynn to the Wynn brand, wrote:

> With respect to the soft asset value, which refers to the company's brand, its ability to capture new licenses and ***the inherent value of its assets could be impaired in our view if Steve Wynn departs.***

55.     Numerous news reports echo the sentiments above regarding the importance of

defendant Steve Wynn to the Company's brand image and business success:

- "What is Wynn Resorts without Steve Wynn? '***Wynn is a very good company in every way, with many capable, excellent people at all levels who execute the vision of Steve Wynn every day,*** ' said [Frank] Fantini, the casino industry publisher. '***But if that vision isn't there, I think over time, it may lose that special quality.*** ' Like Apple in the 1980s, he said, after genius founder Steve Jobs left, it seemed the company 'was missing its special sauce.' Jobs later returned, he said, 'and we got the iPhone.'" *Pressure builds on Wynn; Analysts say he may have to leave casino company he started*, Boston Globe, Feb. 2, 2018.

- *"We revised the outlook to negative to reflect the potential for impairment to Wynn Resorts' brand following the recent allegations of sexual misconduct made against the company's founder and CEO.* There are uncertainties surrounding the outcome of the investigation of the special committee of Wynn Resorts' board of directors and the regulatory review by the Massachusetts Gaming Commission as well as the potential for additional reviews by other gaming regulators." *S&P: Wynn Resorts Ltd. Outlook Revised To Negative On Allegations Against CEO; Ratings Affirmed*, Oreanda News, Feb. 1, 2018.

56.    Defendant Steve Wynn is, therefore, himself material to Wynn, and defendants have a fiduciary duty to disclose and Wynn shareholders have a right to receive material information about him. But here, the adverse material information surrounding defendant Steve Wynn's reported sexual harassment and $7.5 million settlement were, until recently, unknown to Wynn's shareholders. When his indiscretions reached the market, however, the press and investors pummeled Wynn and its share price. As a result, the Company has been, and will continue to be, severely damaged by not only the revelations surrounding defendant Steve Wynn's reported "pattern of sexual misconduct" and the $7.5 million settlement, but also defendants' considered non-disclosure of those adverse, material facts to Wynn shareholders, regulators and the like. To date, Wynn's damages exceed $3.7 billion – substantially in excess of the jurisdictional minimum of this Court.

57.    Defendants have not fared nearly so badly, however. On the contrary, they have collectively pocketed more than $453.1 million, directly or indirectly, from Wynn in trading proceeds and compensation not justified in light of recently disclosed facts regarding their handling of the sexual harassment settlement and claims surrounding defendant Steve Wynn. These payments unjustly enriched defendants at the Company's expense.

58.    However, the Wynn Board has not brought, and will not bring, legal action against the directors and/or officers responsible for this debacle. On the contrary, the Wynn Board has governed awfully for several years now, both generally in relationship to the Company's

independence and executive compensation practices and particularly in relationship to defendant

Steve Wynn. Not only has the Wynn Board favored defendant Steve Wynn again and again in terms

of his excessive compensation, paying him over $94 million, they have also improperly favored

defendant Steve Wynn and his financial interests in corporate battles with former Wynn directors

Kazou Okada and Elaine Wynn, at the expense of Wynn and its shareholders. Indeed, at defendant

Steve Wynn's behest, a majority of the current members of the Wynn Board stripped Mr. Okada of

his Wynn shares based on a purported independent investigation into Mr. Okada's compliance with

the Foreign Corrupt Practices Act. That decision has now exposed Wynn and several Wynn insiders,

including defendants Miller, Irani and Shoemaker, to more than $5 billion in damages in a lawsuit

filed by Mr. Okada against them. As a *CNBC* report recently stated:

> **Wynn Resorts has a problem beyond just the resignation of founder Steve Wynn: a $5 billion problem.** That's how much could be on the line in the lawsuit with his co-founder and former partner Kazuo Okada.
>
> In 2002, the Japanese pachinko king was the money man behind the launch of the company, with Okada and Steve Wynn each owning approximately 20 percent of the shares.
>
> But in 2010, when Steve and Elaine Wynn divorced, they and Okada signed a shareholder agreement limiting the sale and control of their shares. At the time, Okada was becoming the largest shareholder of the split in the Wynn's shares.
>
> In 2012, Wynn Resorts pushed Okada out and forcibly redeemed his roughly 25 million shares, at a 30 percent discount, for $1.9 billion over allegations Okada had bribed Filipino gaming officials.
>
> Now in 2018, with scandals swirling, Okada and Aruze USA, Okada's former holding company, are going to trial against Wynn Resorts. Aruze USA held the shares of Wynn Resorts.
>
> **Based on court records, Okada will argue the board was not acting independently and instead simply obeying the CEO's orders when it pushed Okada out.**
>
> In a 2013 court filing, Okada's lawyers wrote, "Mr. Wynn consistently refused efforts to consider Aruze USA directors for the board, in an effort to continue to monopolize control over Wynn Resorts."

When Wynn Resorts accused Okada of improper payments to Filipino officials, court documents show Okada punching back. Okada lawyers wrote in 2013, "Mr. Okada objected to donation by Wynn Resorts for $135 million to University of Macau," saying the chancellor was the head of the Macau government with ultimate oversight over gaming matters.

The court could determine the board of directors acted responsibly. After all, Nevada regulations give a wide berth to corporate boards who act in good faith. But if the court sides with Okada and Aruze USA, it would be a $5 billion decision.

Those 25 million shares are now worth $4.1 billion. If they're awarded to Okada/Aruze USA, Adam Trivison of Gabelli points out: "His shares dilute the future value to the company."

There's also the question of roughly $700 million in dividends that Okada has not collected. However, he has been earning 2 percent interest payments in escrow on the $1.9 billion promissory note. This is listed as a liability and brings the total down to the neighborhood of $3 billion. The court could also award damages.

The massive dollar amount is just one of the worries the Street has regarding the outcome of the hearing.

"It's a big check, but I'm less concerned about where Wynn gets the money than stability of the ownership of the company," David Katz, gaming analyst for Jeffries, told CNBC.

"I am keenly focused on what the ownership and control structure of the company is going to be," Katz said. "Where is this company headed? It will largely be determined by who its ownership base is."

The animosity between Okada and Wynn is well documented. But Okada's no longer at the helm of Universal Entertainment, which wholly owns Aruze USA, and Steve Wynn is out from his post. With the big warring personalities out of the picture, perhaps Wynn Resorts and Universal Entertainment will be motivated to settle this out of court.

In addition to the Okada suit, investors are looking at a number of other factors: Will Elaine Wynn, who's regaining control of her shares, sell or take a more active interest in the company's operation? Will shareholder and/or victim lawsuits hinder a sale of Wynn assets? And perhaps most importantly, can Wynn Resorts hold on to its gaming licenses in Massachusetts, Nevada and, especially, Macau?

Contessa Brewer, *Wynn Resorts' $5 Billion Problem*, CNBC, Feb. 15, 2018.

59.     The Wynn Board's governance, in a word, is "awful," as assessed by a recent

*Bloomberg* report.  Over the years, it has been overly deferential to defendant Steve Wynn and

favored his financial and personal interests, even at the expense of Wynn and its shareholders. Against this backdrop, the Wynn Board simply cannot be trusted to fairly, objectively and/or independently evaluate the derivative claims asserted in this action against defendant Steve Wynn and/or themselves. But rather, as recently demonstrated by their decision to cancel the Board's investigation into defendant Steve Wynn's reported pattern of sexual harassment, only days after publicly announcing its commencement, and then reportedly restart the investigation a few days later with a new law firm with close ties to Wynn insiders at the helm, the Wynn Board is still trying to reign in disclosure of the facts surrounding defendant Steve Wynn's indiscretions and their own complicity therein. As *Bloomberg* stated:

> *Is there a corporate board in the U.S. worse than the one at Wynn Resorts Ltd.?*
>
> It took two weeks for chairman and chief executive Steve Wynn to step down as a series of exposes about his alleged sexual behavior piled up. The board could've forced the issue sooner, I argued last week, but they were far too deferential to the co-founder of the company, someone with significant ties to many of them.
>
> . . . *It's now clear that the Wynn directors aren't just weak, they're downright awful.* Under the circumstances, the directors are making the biggest possible mistake: *placing the interests of an executive over that of shareholders.*
>
> \*       \*       \*
>
> The Friday before Wynn resigned, the board had taken a step straight out of the corporate crisis playbook: It hired an outside law firm to conduct an independent inquiry. The firm, O'Melveny & Myers, said it was establishing a telephone hotline and a website where current and former Wynn Resorts employees could report instances of sexual harassment by Wynn, according to the Wall Street Journal.
>
> *No sooner had Wynn stepped down than the board canceled the outside investigation, switching gears to its own internal investigation.* And who did they name as the head of the "special committee" overseeing this internal investigation – including the allegation that Wynn paid a $7.5 million settlement to an ex-employee he had forced to have sex with him? Patricia Mulroy, a member of the board who dealt with Wynn for decades as a Nevada state regulator.
>
> \*       \*       \*

*In circling the wagons around Steve Wynn, the Wynn Resorts board is playing a dangerous game.* Gambling is a highly regulated industry that puts a premium on the integrity of gaming operators. Regulators in Nevada, Macau and Massachusetts are all doing their own investigations into Steve Wynn and the company. *They are not going to look kindly on the board's decision to kill the O'Melveny investigation.* And if it turns out that the board knew about the settlement and said nothing, or that it forced the sale of a Wynn foe's 20 percent stake without cause – that is not going to bode well.

Belatedly, the board seems to finally be understanding this. Late Monday, it announced it was going back to Plan A, bringing in an outside law firm to conduct an independent investigation. *Alas, the firm it chose, Gibson Dunn & Crutcher LLP, is one that has "deep ties" with the company, as the Wall Street Journal put it. (Among other things, Sinatra, the general counsel, is a former Gibson Dunn partner.) So it appears that the board is still trying to contain the investigation.*

Now is not the time. Wynn Resorts is in the process of seeking a gaming license in Massachusetts as it builds a $2.4 billion casino complex. *As difficult as it may be for individual directors, they need to finally turn their back on their former leader and start protecting the company.*

Joe Nocera, *Who's Going to Fix Wynn Resorts?  Not Its Board*, Bloomberg, Feb. 14, 2018.

Accordingly, a pre-suit demand upon the Wynn Board to investigate, let alone vigorously prosecute, the derivative claims would be a useless and futile act.

## THE WYNN BOARD'S EXCESSIVE COMPENSATION OF STEVE WYNN

60.     Over the past several years, the Wynn Board and its various committees were charged with promoting, protecting and preserving the Company's assets and business interests. Instead, "mindful that gaming companies" had purportedly "historically provided total compensation packages that may be higher than many of their non-gaming counterparts due to the unique blend of entrepreneurial and managerial skills required to be successful in gaming and certain regulatory and other extraordinary demands," the Board, acting through its Compensation Committee and its Audit Committee, not only gave Steve Wynn full run of the Company's assets to use as his personal fiefdom, providing him with a luxurious onsite all-expenses paid private abode overlooking the golf course at Wynn Las Vegas, unlimited private air travel, unlimited services of a private driver,

unlimited access to medical services, "the personal use of [Wynn] employees, construction work and other personal services," and other free Wynn "merchandize" of an undisclosed nature, Steve Wynn's annual salary and massive bonuses had no limits. As detailed below, during fiscal years 2013-2016 alone, Wynn paid Steve Wynn more than $94 million in total compensation, on top of his more than $217.3 million in stock sale proceeds. And despite repeated criticism from the financial media and corporate governance experts about just how outlandish Steve Wynn's pay had grown, the Board refused to rein it in, repeatedly opting to find different and more lucrative ways to pay defendant Steve Wynn.

61.     For example, on January 3, 2013, Wynn and Steve Wynn entered into an agreement pursuant to which Steve Wynn agreed to terminate a previously granted option to purchase an approximately two-acre tract of land located on the Wynn Las Vegas golf course and, in return, the Company granted Steve Wynn the right to purchase any or all of the aircraft owned by the Company or its direct wholly-owned subsidiaries. The aircraft purchase option is exercisable upon 30 days written notice and at a price equal to the book value of such aircraft and will terminate on the date of termination of the employment agreement, which now expires in October 2022.

62.     On April 6, 2013, *The New York Times* published a highly critical exposé on executive compensation, entitled "The Infinity Pool of Executive Pay," that challenged Steve Wynn's excessive use of the Company-funded airplane and rent-free living in two luxury villas, stating in pertinent part as follows:

> *As chief executive of Wynn Resorts, he sat back and enjoyed more than a million dollars' worth of personal travel last year on his company's private jet.*
>
> It gets better: in December, the company took delivery of the first G650 jet to roll off Gulfstream's assembly line. A $65 million wonder, the plane can whisk Mr. Wynn from Las Vegas, where Wynn Resorts has its headquarters, to New York, where he owns a $70 million penthouse overlooking Central Park, and it should make 2013 another busy year aloft for him. (Wynn Resorts declined to comment.)

*   *   *

Personal travel on the company plane may be the favorite perk, but a few chief executives managed to gain some other interesting freebies. *Mr. Wynn, for example, enjoyed a villa in Las Vegas that cost the company $451,574 for the year.*

63.     Pursuant to a May 7, 2013 amendment to the lease agreement, the rental value on the three luxury Fairway Villa suites Steve Wynn was using as his permanent residence at Wynn Las Vegas was increased from $440,000 to $525,000 per year. The lease agreement still required Wynn to provide warehouse space and to pay for all capital improvements to the villas, provide maintenance and cleaning services, and pay all taxes and utilities for the villas. The only living expenses allocated to Steve Wynn were any extra maid services he used (above and beyond the two days per week provided under the lease terms) and his long-distance telephone phone calls. While Steve Wynn and Wynn claimed that the $1,474.72 per night rent was based on fair market value, the same villas are now known to rent commercially for upwards of $4,500 per night. The Board's Audit Committee charged with approving the lease agreement then consisted of defendants Hagenbuch, Miller, Shoemaker and Wayson.

64.     For 2013, Wynn paid defendant Steve Wynn a base salary of $4 million and made him eligible for a maximum cash bonus of up to 250% of his base salary. For 2013, the Compensation Committee, comprised of defendants Virtue, Hagenbuch, Irani and Shoemaker, used a formula similar to the prior year's to determine Steve Wynn's cash bonus. That formula – base salary ($4 million) x bonus factor (125% "partial" or 250% "maximum") x EBITDA performance level (at least $1.10 billion for the partial bonus or $1.375 billion for the maximum bonus) – again made either a partial bonus of $5 million or a maximum bonus of $10 million possible. Based on the reported adjusted property EBITDA of $1.811 billion for that year, Wynn paid Steve Wynn the maximum cash bonus of $10 million. The Compensation Committee also approved an additional $4

million cash bonus payable to Steve Wynn "from Wynn Macau, Limited in consideration of finalization of plans for Wynn Palace in Cotai and his contribution to the extraordinary performance of Wynn Macau for the year ended December 31, 2013." Along with his salary, cash bonuses, cash distributions on unvested restricted stock, personal use of the Company aircraft valued at $927,829, purported "fair market value" of the luxury villas of $525,000, executive life and medical insurance premiums of $33,293, personal use of a driver valued at $130,245, and "merchandize discounts" of $56,196, Wynn paid Steve Wynn more than $19.6 million in compensation for 2013.

65.    For 2014, Wynn Resorts paid defendant Steve Wynn a base salary of $4 million and made him eligible for a maximum bonus of up to $25 million.  For 2014, the Compensation Committee, comprised of defendants Virtue, Hagenbuch, Irani and Shoemaker, approved the use of three performance goals: (i) achievement of a 2014 adjusted property EBITDA of $1.5 billion for a partial bonus or $1.6 billion for the maximum bonus; (ii) retention of specified third-party recognition of quality and performance as of December 1, 2014; and (iii) achievement of certain goals related to the development of Wynn Palace as of December 1, 2014.  If each of the 2014 performance goals was achieved at the maximum level, Steve Wynn would receive a maximum bonus of $25 million, with $10 million payable in cash and $10 million payable in equity.  Based on the reported adjusted property EBITDA of $1.77 billion for that year, receiving certain travel guide acclaim, and the Company remaining on track to open Wynn Palace by December 1, 2014, Wynn paid Steve Wynn the maximum cash bonus of $20 million, with $10 million paid in cash and $10 million paid in stock awards.  Along with his salary, bonuses, cash distributions on unvested restricted stock, personal use of the Company aircraft valued at $1,049,798, executive life and medical insurance premiums of $41,549, personal use of a driver of $163,216, and "merchandize discounts" of $68,291, Wynn paid Steve Wynn more than $25.3 million in compensation for 2014.

66.     On January 15, 2015, the term of defendant Steve Wynn's employment agreement was extended to October 24, 2022; the annual salary provision was amended to reduce Steve Wynn's annual salary to $2.5 million; and the corporate aircraft provision was amended to provide that Steve Wynn now had the right to the personal use of the Company-funded aircraft for him, his family and his social guests, pursuant to separate time-sharing agreements for such personal use.  The Board's Compensation Committee then consisted of defendants Virtue, Hagenbuch, Irani and Shoemaker.

67.     On April 5, 2015, *The New York Times* reported that Institutional Shareholder Services, Inc. ("ISS") – which advises professional investors on how to manage corporate governance risk related to their holdings – had issued a blistering assessment of the Wynn Board, "attack[ing] the casino conglomerate's compensation structure, question[ing] Mr. Wynn's 'excessive aircraft use' and express[ing] frustration at board secrecy."  *The New York Times* quoted the ISS report, which chastised the Wynn Board for "'tolerating weak governance practices, poor pay practices, or an overall corporate governance profile that ranks among the worst, not the best, of U.S. companies.'"  *The New York Times* further quoted ISS as lamenting that, "[i]n urging shareholders to withhold votes from the two renominated incumbent board members, J. Edward Virtue and John J. Hagenbuch, and reject Ms. Wynn, the report said they can 'send a strong signal to the remaining directors about the board's continuing acceptance of poor pay practices, as outlined extensively in our analysis of the executive compensation plan.'"  Wynn was then rated a "10" by ISS QuickScore, representing the highest level of governance risk under the decile-based scoring system.

68.     On April 9, 2015, *CEO Pay* published a report further chastising the Board and its failure to reign in Steve Wynn's excessive compensation to the detriment of shareholders, stating, in relevant part, as follows:

> When a company is performing well, some ask, why should shareholders care about compensation?  The answer becomes most obvious after a company isn't doing

well: poor compensation can be the first visible symptom of a board that is not engaged in protecting the interests of shareholders. Certainly, one can imagine that in the context of the market capitalization a request from the CEO for a perquisite may be hard to deny, *but a board in the habit of never denying the CEO anything is not a board focused on the important issues of strategy and sustainability that they should be focused on.*

  *A clear example today can be seen at Wynn Resorts, with corporate governance as close to a soap opera as it can get in recent months,* where questionable compensation may have been an early clue to larger issues. . . .

  *Stephen Wynn's total compensation has been higher than his peers for many years.* Among the features shareholders objected to were his $4 million salary, his routinely large non-equity incentive payment (which was $10 million again in 2014), excessive perquisites and non-performance based bonuses. The company notes that it did a complete overhaul of compensation in 2014 after conversations with shareholders. This year, for the first time, 50% of Wynn's annual incentive award was paid in equity.

  However, most of the reforms were not effective in fiscal year 2014, and required a revised employment agreement for the CEO. The January 2015 agreement lowers the salary to $2.5 million, *a reduction that would still place his salary among the top 10 in S&P 500 companies.* In addition, it replaces an aircraft time sharing agreement and will require Wynn to reimburse the company for certain expenses related to personal use of aircraft. *However, he will receive a $250,000 credit each year "to offset his reimbursement obligations," suggesting that this might be more of a slight of hand than substantive reform.* The agreement also lengthens the term of the agreement with Wynn, who is now 72 years old, extending it through October 24, 2022.

(Original emphasis omitted.)

  69. For 2015, Wynn reduced defendant Steve Wynn's base salary to $2.5 million, but also made him eligible for a maximum cash bonus of up to $25 million. The Compensation Committee, comprised of defendants Virtue, Hagenbuch, Irani, Mulroy and Shoemaker, said they reduced Steve Wynn's annual salary "in order to reduce elements of fixed, non-performance based compensation, such as salary and perquisites, and to make a greater percentage of his total compensation variable and performance-based." For his annual bonus, the Compensation Committee approved the use of three performance goals: (i) a 2015 adjusted property EBITDA goal

of $900 million for a partial bonus or $1 billion for the maximum bonus (down significantly from the prior year); (ii) a goal that would be satisfied if, as of December 1, 2015, at least one of the Wynn properties maintained Forbes Five-Star distinction; and (iii) a goal that would be satisfied if, as of December 1, 2015, Wynn Palace was on track to open in 2016. If each of the 2015 performance goals was achieved at the maximum level, Steve Wynn was eligible to receive a maximum bonus of $25 million, with $8.75 million payable in cash and $8.75 million payable in equity. Based on the reported adjusted property EBITDA of $1.86 billion for that year, the Company having maintained its Forbes Five-Star distinction at Wynn Macau and at Wynn Las Vegas, and, as of December 1, 2015, Wynn Palace remaining on track to open in 2016, Wynn paid Steve Wynn the maximum bonus of $8.75 million in cash and $8.75 million in stock awards. Along with his salary, bonuses, cash distributions on unvested restricted stock, personal use of the Company aircraft valued at $250,000, personal security expenses of $271,306, executive life and medical insurance premiums of $77,295, personal use of a driver valued at $34,984, "merchandize discounts" of $28,149, and reimbursement of taxes related to work performed in the State of Massachusetts of $18,657, even with the Compensation Committee's purported salary reductions, Wynn still paid Steve Wynn more than $20.6 million in compensation for 2015.

70.     For fiscal year 2016, Wynn again paid Steve Wynn a base salary of $2.5 million and he was now made eligible for a maximum cash bonus of up to $30 million. For 2016, the Compensation Committee, comprised of defendants Virtue, Hagenbuch, Johnson and Shoemaker, approved the use of three performance goals: (i) 2016 adjusted property EBITDA of $1.4 billion for the maximum bonus, $1.2 billion for the target bonus, or $1 billion for a partial bonus; (ii) Forbes Five-Star distinction in hotel, food and beverage or spa categories for Wynn Las Vegas and Wynn Macau; and (iii) Wynn Palace opening on or before December 31, 2016. If each of the 2016

performance goals was achieved at the maximum levels, Steve Wynn was eligible to receive a threshold bonus of $20 million, a target bonus of $25 million, or a maximum bonus of $30 million, with $12.5 million payable in cash and $12.5 million payable in equity. Based on the reported adjusted property EBITDA of $1.26 billion for that year, the Company maintaining its Forbes Five-Star distinction at both Wynn Las Vegas and Wynn Macau, and Wynn Palace opening on August 22, 2016, Wynn paid Steve Wynn the target cash bonus, $25 million, with $12.5 million paid in cash and $12.5 million paid in stock awards. Along with his salary, bonuses, cash distributions on unvested restricted stock, personal use of the Company aircraft valued at $250,000, personal security expenses valued at $207,199, executive life and medical insurance premiums of $32,088, personal use of a driver valued at $131,479, "merchandize discounts" of $33,959, and reimbursement of taxes related to work performed in the State of Massachusetts of $2,260, Wynn paid Steve Wynn more than $28.1 million in compensation for 2016.

71.     Pursuant to a December 1, 2016 amendment to the Fairway Villa Suites lease agreement, the rent value attributable to Steve Wynn's use of the luxury Fairway Villa suites at Wynn Las Vegas as his personal residence was reduced to $305,680 per year, purportedly to reflect reduced space. The lease agreement continued to afford him warehouse space and still had Wynn paying for all capital improvements to the villas, providing maintenance and cleaning services, and paying all taxes and utilities for the villas. The only living expenses allocated to Steve Wynn included any extra maid services he uses (above and beyond the two days per week provided under the lease terms) and his long-distance telephone phone calls. While Steve Wynn and Wynn claim the $837.48 per night rent is based on market values, the same villas are known to rent commercially for upwards of $4,500 per night. The Board's Audit Committee charged with approving the lease agreement then consisted of defendants Hagenbuch, Miller, Shoemaker and Wayson.

## THE WYNN BOARD COMPENSATED ITSELF EXCESSIVELY AS WELL

72.     In addition to handsomely enriching Steve Wynn, the members of the Board handsomely rewards themselves with a compensation package that presently includes at least the following remuneration:

| | |
|---|---|
| Annual Board Fees | Annual $60,000/Monthly $5,000 |
| | Plus unlimited complimentary room, food and beverage privileges at Wynn properties |
| Board Meeting Attendance Fees | $1,500 per meeting |
| | Plus reimbursement for any out-of-pocket expenses related to attendance |
| Annual Audit Committee Fees | Chair: Annual $30,000/Monthly $2,500 |
| | Member: Annual $15,000/Monthly $1,500 |
| Audit Committee Meeting Attendance Fees | $1,500 per meeting |
| | Plus reimbursement for any out-of-pocket expenses related to attendance |
| Annual Compensation Committee Fees | Chair: Annual $24,000/Monthly $2,000 |
| | Member: Annual $12,000/Monthly $1,000 |
| Compensation Committee Meeting Attendance Fees | $1,500 per meeting |
| | Plus reimbursement for any out-of-pocket expenses related to attendance |
| Annual Corporate Governance Committee Fees | Chair: Annual $24,000/Monthly $2,000 |
| | Member: Annual $12,000/Monthly $1,000 |
| Corporate Governance Committee Meeting Attendance Fees | $1,500 per meeting |
| | Plus reimbursement for any out-of-pocket expenses related to attendance |
| Annual Corporate Compliance Committee Fees | Chair: Annual $70,000 Retainer |
| | Member: Annual $25,000 Retainer |
| Lead Independent Director Fee | Annual $50,000 Retainer |
| Restricted Stock/Stock Option Grants | As determined each year |
| | Plus additional grants, including upon appointment to the Board |

73. Based on these (and corresponding sums paid in prior years), Wynn's Board members have paid themselves at least $11.1 million in compensation since 2013, which does not include, among other things, their unlimited use of complimentary room, food and beverage privileges at Wynn properties throughout the year:

| Defendant | Year | Cash Fee | Stock Awards | Option Awards | Other Comp. | Total |
|---|---|---|---|---|---|---|
| Hagenbuch | 2013 | $115,806.00 | $0.00 | $252,064.00 | $0.00 | $367,870.00 |
| | 2014 | $124,500.00 | $0.00 | $249,529.00 | $0.00 | $374,029.00 |
| | 2015 | $131,750.00 | $249,884.00 | $0.00 | $2,927.00 | $384,561.00 |
| | 2016 | $144,000.00 | $249,963.00 | $0.00 | $7,010.00 | $400,973.00 |
| Total: | | $516,056.00 | $499,847.00 | $501,593.00 | $9,937.00 | $1,527,433.00 |
| | | | | | | |
| Irani | 2013 | $115,194.00 | $0.00 | $252,064.00 | $2,500.00 | $369,758.00 |
| | 2014 | $111,000.00 | $0.00 | $249,529.00 | $0.00 | $360,529.00 |
| | 2015 | $114,000.00 | $249,884.00 | $0.00 | $2,927.00 | $366,811.00 |
| | 2016 | $105,433.00 | $249,963.00 | $0.00 | $7,010.00 | $362,406.00 |
| Total: | | $445,627.00 | $499,847.00 | $501,593.00 | $12,437.00 | $1,459,504.00 |
| | | | | | | |
| Johnson | 2016 | $31,935.00 | $0.00 | $349,000.00 | $0.00 | $380,935.00 |
| | | | | | | |
| Miller | 2013 | $203,500.00 | $0.00 | $252,064.00 | $2,500.00 | $458,064.00 |
| | 2014 | $256,500.00 | $0.00 | $249,529.00 | $0.00 | $506,029.00 |
| | 2015 | $255,000.00 | $249,884.00 | $0.00 | $2,927.00 | $507,811.00 |
| | 2016 | $261,000.00 | $249,963.00 | $0.00 | $7,010.00 | $517,973.00 |
| Total: | | $976,000.00 | $499,847.00 | $501,593.00 | $12,437.00 | $1,989,877.00 |
| | | | | | | |
| Mulroy | 2015 | $22,113.00 | $0.00 | $223,162.00 | $0.00 | $245,275.00 |
| | 2016 | $118,500.00 | $249,963.00 | $0.00 | $3,839.00 | $372,302.00 |
| Total: | | $140,613.00 | $249,963.00 | $223,162.00 | $3,839.00 | $617,577.00 |
| | | | | | | |
| Randt | 2015 | $14,081.00 | $0.00 | $223,162.00 | $0.00 | $237,243.00 |
| | 2016 | $73,500.00 | $249,963.00 | $0.00 | $3,839.00 | $327,302.00 |
| Total: | | $87,581.00 | $249,963.00 | $223,162.00 | $3,839.00 | $564,545.00 |
| | | | | | | |
| Shoemaker | 2013 | $121,500.00 | $0.00 | $252,064.00 | $2,500.00 | $376,064.00 |
| | 2014 | $123,000.00 | $0.00 | $249,529.00 | $0.00 | $372,529.00 |
| | 2015 | $123,000.00 | $249,884.00 | $0.00 | $2,927.00 | $375,811.00 |
| | 2016 | $127,500.00 | $249,963.00 | $0.00 | $7,010.00 | $384,473.00 |

| | | | | | |
|---|---|---|---|---|---|
| **Total:** | | **$495,000.00** | **$499,847.00** | **$501,593.00** | **$12,437.00** | **$1,508,877.00** |
| | | | | | |
| **Virtue** | 2013 | $118,806.00 | $0.00 | $252,064.00 | $0.00 | $370,870.00 |
| | 2014 | $123,000.00 | $0.00 | $249,529.00 | $0.00 | $372,529.00 |
| | 2015 | $126,000.00 | $249,884.00 | $0.00 | $2,927.00 | $378,811.00 |
| | 2016 | $127,500.00 | $249,963.00 | $0.00 | $7,010.00 | $384,473.00 |
| **Total:** | | **$495,306.00** | **$499,847.00** | **$501,593.00** | **$9,937.00** | **$1,506,683.00** |
| | | | | | |
| **Wayson** | 2013 | $138,000.00 | $0.00 | $252,064.00 | $2,500.00 | $392,564.00 |
| | 2014 | $139,500.00 | $0.00 | $249,529.00 | $0.00 | $389,029.00 |
| | 2015 | $129,250.00 | $249,884.00 | $0.00 | $2,927.00 | $382,061.00 |
| | 2016 | $127,500.00 | $249,963.00 | $0.00 | $7,010.00 | $384,473.00 |
| **Total:** | | **$534,250.00** | **$499,847.00** | **$501,593.00** | **$12,437.00** | **$1,548,127.00** |
| | | | | | |
| **Grand Total:** | | **$3,722,368.00** | **$3,499,008.00** | **$3,804,882.00** | **$77,300.00** | **$11,103,558.00** |

74.     While over-compensating themselves, the Board has also lavished excessive compensation on senior Wynn executives other than defendant Steve Wynn. As detailed below, Wynn's President, defendant Maddox, and General Counsel, defendant Sinatra, have collectively have pocketed more than $30.4 million in salary, stock awards and other compensation since 2013 alone:

| Defendant | Year | Salary | Stock Awards | Incentive Plan Comp. | Other Comp. | Total |
|---|---|---|---|---|---|---|
| **Maddox** | 2016 | $1,500,000 | $1,500,000 | $1,500,000 | $114,703 | $4,614,703 |
| | 2015 | $1,500,000 | $1,200,000 | $1,200,000 | $178,932 | $4,078,932 |
| | 2014 | $1,500,000 | $1,500,000 | $1,500,000 | $314,400 | $4,814,400 |
| | 2013 | $1,065,385 | $1,635,900 | $2,000,000 | $358,009 | $5,059,294 |
| **Total** | | **$5,565,385** | **$5,835,900** | **$6,200,000** | **$966,044** | **$18,567,329** |
| | | | | | | |
| **Sinatra** | 2016 | $873,654 | $850,000 | $850,000 | $65,086 | $2,638,740 |
| | 2015 | $850,000 | $680,000 | $680,000 | $129,156 | $2,339,156 |
| | 2014 | $840,769 | $2,474,875 | $850,000 | $160,310 | $4,325,954 |
| | 2013 | $800,000 | $0.00 | $1,600,000 | $180,881 | $2,580,881 |
| **Total** | | **$3,364,423** | **$4,004,875** | **$3,980,000** | **$535,433** | **$11,884,731** |

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

75.     On March 31, 2014, by order of the Board, Wynn issued its 2014 Proxy Statement,

which the Company also filed with the SEC. In the 2014 Proxy Statement, defendants Virtue,

Miller, Irani, Wayson, Hagenbuch, Shoemaker, Steve Wynn and Sinatra described the key

components of Wynn's purportedly strong corporate governance, stating, in relevant part, as follows:

> **Our Governance Program**. Our Board and management are committed to
> sound and effective corporate governance. Consistent with this commitment, *the*
> *Company has established a comprehensive corporate governance framework*, with
> policies and programs designed not only to satisfy the extensive regulatory
> requirements applicable to our business *but to build value for the Company's*
> *stockholders and promote the vitality of the Company for* its customers, *employees*
> and the other individuals and organizations that depend upon it.

*     *     *

> **Corporate Social Responsibility**. In addition, *we operate our business in a*
> *manner that incorporates our core values of compassion and responsibility*,
> including participating in wide ranging community service and philanthropic efforts
> that assist underserved communities in the markets in which we operate.

*     *     *

> **Chairman and CEO**. Mr. Wynn currently serves as the Chairman and CEO
> of the Company. . . . Mr. Wynn is the founder, creator and name behind our brand.
> He brings extraordinary talent to our Company that is unrivaled by others in our
> industry. In addition, the Board believes that *Mr. Wynn's combined role as*
> *Chairman and CEO promotes unified leadership and direction for the Board and*
> *management*, and provides *focused leadership for the Company's operational and*
> *strategic efforts*.

*     *     *

> **Other Board Governance Measures**. The combined role of Chairman and
> CEO is further balanced by *the Board's demonstrated commitment and ability to*
> *provide independent oversight of management*. Six of the eight members of our
> Board satisfy the most stringent requirements of independence promulgated by the
> Exchange Act and the NASDAQ for audit and compensation committee members,
> and the Audit, Compensation, and Nominating and Corporate Governance
> Committees are each comprised entirely of independent members of the Board. This
> structure encourages independent and effective oversight of the Company's
> operations and prudent management of risk. In addition, the Company is subject to
> stringent regulatory requirements and oversight, combining our internal controls with

- 38 -

third-party monitoring of the Company's operations. The independent members of the Company's Board meet separately in executive session at each regular meeting of the Board. The members of the Audit Committee also meet separately in executive session with each of the Company's independent auditors, Vice President of Internal Audit, Chief Financial Officer, General Counsel and Compliance Officer. The independent Presiding Director is responsible for communicating to the CEO and management all concerns that arise during executive sessions. In addition, all Committee agendas and all agendas for meetings of the Board are provided in advance to all independent members of the Board. The members are encouraged to, and do, review the proposed agenda items and add additional items of concern or interest.

*      *      *

### Risk Oversight

*The Board has an active role in overseeing the Company's areas of risk. The Board and its Committees regularly review information regarding the Company's risk profile* and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance, legislative and political conditions, capital availability, liquidity and general financial conditions, gaming credit extension and collection, construction, catastrophic events and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for management to identify, manage and mitigate these risks. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee. *Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures.* In addition, throughout the year, the Board, its Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance.

76.     Discussing defendant Steve Wynn's "extraordinary talent," defendants in the 2014

Proxy Statement further stated, in relevant part, as follows:

*Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.* Mr. Wynn has served as our CEO since the Company's inception in 2002, and during that period, has delivered exceptional value to our stockholders. . . . *He brings extraordinary talent to our Company that is unrivaled in our industry.* The

Compensation Committee believes that Mr. Wynn's contributions to our longstanding, consistent achievement over the last decade have been, and continue to be, instrumental in creating significant stockholder value.

77.     On March 16, 2015, by order of the Board, Wynn issued its 2015 Proxy Statement, which the Company also filed with the SEC. In the 2015 Proxy Statement, defendants Virtue, Miller, Irani, Wayson, Hagenbuch, Shoemaker, Steve Wynn and Sinatra described the key components of Wynn's purportedly strong corporate governance, stating, in relevant part, as follows:

> **Our Governance Program.** Our Board and management are committed to sound and effective corporate governance. Consistent with this commitment, *the Company has established a comprehensive corporate governance framework*, with policies and programs designed not only to satisfy the extensive regulatory requirements applicable to our business but *also to build value for the Company's stockholders and promote the vitality of the Company for* its customers, *employees* and the other individuals and organizations that depend upon it.
>
> \*        \*        \*
>
> **Corporate Social Responsibility.** In addition, *we are committed to operating our business in a manner that incorporates our core values of compassion and responsibility*, including participating in wide ranging community service and philanthropic efforts that assist underserved communities in the markets in which we operate. We issued a corporate social responsibility and sustainability report on our website in 2014 and plan to issue additional reports periodically.
>
> \*        \*        \*
>
> **Chairman and CEO.** *Mr. Wynn currently serves as the Chairman and CEO of the Company.* Mr. Wynn has served in these roles since the Company's inception in 2002. We believe that during that period he has delivered exceptional value to our stockholders. . . . *Mr. Wynn is the founder, creator and name behind our brand. We believe he brings extraordinary talent to our Company that is unrivaled by others in our industry.*
>
> \*        \*        \*
>
> **Risk Oversight**
>
> The Board has an active role in overseeing the Company's areas of risk. The Board and its Committees regularly review information regarding the Company's risk profile and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance, legislative and political conditions, capital availability, liquidity and

general financial conditions, gaming credit extension, collection, construction, catastrophic events and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for identifying, managing and mitigating these risks. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee. *Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures.* In addition, throughout the year, the Board, its Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance. For the 2014 fiscal year, management completed a review of the Company's compensation policies and practices and presented its analysis to the Compensation Committee.    The Compensation Committee concurred with management's conclusion that such policies and practices do not present risks that are reasonably likely to have a material adverse effect on the Company.

78.    Discussing defendant Steve Wynn's "extraordinary talent," defendants in the 2015 Proxy Statement further stated, in relevant part, as follows:

> **Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.** Mr. Wynn has served as our CEO since the Company's inception in 2002, and we believe that *during that period he has delivered exceptional value to our stockholders.* . . . Mr. Wynn is the founder, creator and name behind our brand. *We believe that he brings extraordinary talent to our Company that is unrivaled in our industry.*

79.    On March 4, 2016, by order of the Board, Wynn issued its 2016 Proxy Statement, which the Company also filed with the SEC.  In the 2016 Proxy Statement, defendants Virtue, Miller, Irani, Wayson, Hagenbuch, Shoemaker, Steve Wynn and Sinatra described the key components of Wynn's purportedly strong corporate governance, stating, in relevant part, as follows:

> **Our Governance Program.** Our Board and management are committed to sound and effective corporate governance.  Consistent with this commitment, *the Company has established a comprehensive corporate governance framework,* with policies and programs designed not only to satisfy the extensive regulatory requirements applicable to our business but also *to build value for the Company's*

*stockholders and promote the vitality of the Company for* its customers, employees and the other individuals and organizations that depend upon it.

*   *   *

**Corporate Social Responsibility**.  In addition, *we are committed to operating our business in a manner that incorporates our core values of compassion and responsibility*, including participating in wide-ranging community service and philanthropic efforts that assist underserved communities in the markets in which we operate.

*   *   *

**Chairman and CEO**. *Mr. Wynn currently serves as the Chairman and CEO of the Company*.  Mr. Wynn has served in these roles since the Company's inception in 2002.  We believe that during his tenure, *Mr. Wynn has delivered exceptional value to our stockholders*.

*   *   *

**Other Board Governance Measures**.  The combined role of Chairman and CEO is further balanced by *the Board's demonstrated commitment and ability to provide independent oversight of management*.  Seven of the nine members of our Board satisfy the most stringent requirements of independence under the Exchange Act and NASDAQ for audit committee members, and the Audit, Compensation, and Corporate Governance Committees are each comprised entirely of independent members of the Board.  We believe this structure encourages independent and effective oversight of the Company's operations and prudent management of risk.  In addition, the Company is subject to stringent regulatory requirements and oversight, combining our internal controls with third-party monitoring of the Company's operations.  The independent members of the Company's Board meet separately in executive session at each regular meeting of the Board.  The members of the Audit Committee also meet separately in executive session with each of the Company's independent auditors, the Vice President of Internal Audit, the Chief Financial Officer, the General Counsel and the Compliance Officer.  The Lead Independent Director is responsible for communicating to the CEO and management all concerns that arise during executive sessions.  In addition, all Committee agendas and all agendas for meetings of the Board are provided in advance to all independent members of the Board.  The independent directors are encouraged to, and do, review the proposed agenda items and add additional items of concern or interest.

*   *   *

**Risk Oversight**

The Board has an active role in overseeing the Company's areas of risk.  The Board and its Committees regularly review information regarding the Company's

- 42 -

risk profile and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance, legislative and political conditions, capital availability and liquidity, gaming credit extension and collection, construction, catastrophic events and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for identifying, managing and mitigating these risks. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee. ***Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures.*** In addition, throughout the year, the Board, its Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance. For the 2015 fiscal year, management completed a review of the Company's compensation policies and practices and presented its analysis to the Compensation Committee. The Compensation Committee concurred with management's conclusion that such policies and practices do not present risks that are reasonably likely to have a material adverse effect on the Company.

80. Discussing defendant Steve Wynn's "extraordinary talent," defendants in the 2016 Proxy Statement further stated, in relevant part, as follows:

> ***Mr. Wynn's Talent, Image and Likeness Are Key to our Continued Success.*** Mr. Wynn has served as our CEO since the Company's inception in 2002, and we believe that ***during that period he has delivered exceptional value to our stockholders.*** ... Mr. Wynn is the founder, creator and name behind our brand. ***We believe that he brings extraordinary talent to our Company that is unrivaled in our industry.***

81. On March 10, 2017, by order of the Board, Wynn issued its 2017 Proxy Statement, which the Company also filed with the SEC. In the 2017 Proxy Statement, defendants Virtue, Randt, Miller, Mulroy, Irani, Wayson, Hagenbuch, Johnson, Shoemaker, Steve Wynn and Sinatra described the key components of Wynn's purportedly strong corporate governance, stating, in relevant part, as follows:

**Our Governance Program**. Our Board and management are committed to sound and effective corporate governance. Consistent with this commitment, *the Company has established a comprehensive corporate governance framework*, with policies and programs designed not only to satisfy the extensive regulatory requirements applicable to our business but also *to build value for the Company's stockholders and promote the vitality of the Company for* its customers, *employees* and the other individuals and organizations that depend upon it.

*   *   *

**Corporate Social Responsibility**. *We are committed to operating our business in a manner that incorporates our core values of compassion and responsibility*, including participating in wide-ranging community service and philanthropic efforts that assist underserved communities in the markets in which we operate.

*   *   *

**Chairman and CEO**. Mr. Wynn has served as the Chairman and CEO of the Company since its formation in 2002. . . .

. . . [T]he Board believes that Mr. Wynn's combined role as Chairman and CEO *promotes unified leadership and direction for the Board and management*, and provides focused leadership for the Company's operational and strategic efforts.

*   *   *

**Other Board Governance Measures**. The combined role of Chairman and CEO is further balanced by *the Board's demonstrated commitment and ability to provide independent oversight of management*. As discussed in greater detail below, eight of the ten members of our Board satisfy the most stringent requirements of independence under the Exchange Act and NASDAQ for audit committee members, and the Audit, Compensation, and Corporate Governance Committees are each comprised entirely of independent members of the Board. *We believe this structure encourages independent and effective oversight of the Company's operations and prudent management of risk*. In addition, the Company is subject to stringent regulatory requirements and oversight, combining our internal controls with third-party monitoring of the Company's operations. The independent members of the Board meet separately in executive session at each regular meeting of the Board. The members of the Audit Committee also meet separately in executive session with each of the Company's independent auditors, General Counsel, Chief Audit Executive, Chief Financial Officer and Compliance Officer. The Lead Independent Director is responsible for communicating to the CEO and management all concerns that arise during executive sessions. In addition, all Committee agendas and all agendas for meetings of the Board are provided in advance to all independent members of the Board. The independent directors are encouraged to, and do, review the proposed agenda items and add additional items of concern or interest.

*    *    *

**Risk Oversight**

*The Board has an active role in overseeing the Company's areas of risk. The Board and its Committees regularly review information regarding the Company's risk profile* and have, in consultation with management and the Company's independent auditors, identified specific areas of risk including: regulatory compliance; legal, legislative and political conditions; capital availability and liquidity; gaming credit extension and collection; construction; catastrophic events; and succession planning. The Board (as a whole and through its Committees) has reviewed and approved management's process for identifying, managing and mitigating these risks. While the full Board has overall responsibility for risk oversight, the Board has assigned certain areas of risk oversight to its Committees as well as to the Company's Compliance Committee. *Throughout the year, the Board, its Committees and the Company's Compliance Committee receive reports from management that include information regarding major risks and exposures facing the Company and the steps management has taken to monitor and control such risks and exposures.* In addition, throughout the year, the Board, its Committees and the Company's Compliance Committee dedicate a portion of their meetings to review and discuss specific risk topics in greater detail. The Audit Committee is primarily responsible for the oversight of credit, related party, construction and general financial risks. The Company's Compliance Committee primarily oversees risks relating to regulatory, security and political compliance.

82. Discussing defendant Steve Wynn's "leadership" and "extraordinary talent," defendants further stated in the 2017 Proxy Statement, in relevant part, as follows:

**Mr. Wynn's Talent, Image and Likeness Are Key to Our Continued Success.** . . . Under Mr. Wynn's leadership, from our initial public offering in 2002 through the end of 2016, we have paid approximately $6.4 billion, or $58.75 per share, in dividends to our stockholders. . . . *We believe that he brings extraordinary talent to our Company that is unrivaled in our industry.*

83. The 2014-2017 Proxy Statements were materially false and misleading, and/or omitted to disclose material facts necessary to render them not misleading, when issued. The Proxy Statements failed to disclose, among other things, defendant Steve Wynn's reported "pattern of sexual misconduct" and the $7.5 million settlement with a Wynn employee for alleged harassment and the non-disclosure of the adverse material information regarding Steve Wynn's reported sexual harassment to gaming-industry authorities. And, further still, the Proxy Statements misrepresented,

- 45 -

and/or failed to disclose, that the Board's purportedly extensive corporate governance framework was insufficiently robust enough detect, deter and prevent sexual harassment of Wynn's female employees, including reportedly by the Company's now former Chairman and CEO, defendant Steve Wynn.

## DAMAGE TO THE COMPANY

84.     As a direct and proximate result of defendants' misconduct, Wynn has been severely damaged.  Indeed, the public reaction to the news of defendant Steve Wynn's reported sexual harassment has been fast and furious.  In just a few weeks, the trading price of Wynn shares had declined by nearly 19%, wiping out over $3.7 billion in once valuable shareholders' equity. Regulators have opened investigations into existing and pending approvals of the Company's gaming licenses, endangering Wynn's ability to profitably conduct its business.  Moreover, the Company is now the subject of countless negative news reports discussing sexual harassment at Wynn and the Board's serial failure to provide effective direction, leadership and oversight.

85.     For example, on January 26, 2018, the *Las Vegas Review-Journal* published an article entitled "Sexual misconduct claims against Steve Wynn draw calls for his ouster," stating:

> A national organization has called for Wynn Resorts Chairman and CEO Steve Wynn to be removed from the company, and Massachusetts gaming regulators said they would investigate allegations that he demanded sex from and assaulted several of his resort employees over three decades.
>
> The company's stock plunged more than 10 percent Friday as shock waves reverberated through Southern Nevada and nationwide over the multiple allegations of sexual impropriety involving the man who built The Mirage, Bellagio and the international resort company that bears his name.
>
> The allegations were first reported Friday by The Wall Street Journal, which said it contacted more than 150 people for the story.  The story included several graphic accounts of alleged interactions between Wynn and employees, including one case that led to a $7.5 million settlement with a manicurist.

At the close of trading Friday, Wynn Resorts stock had dropped by 10.1 percent, or $20.31, to $180.29 per share, according to figures on Yahoo Finance. Volume was 20 times the normal average. By comparison, the Dow Jones Industrial Average was up 0.85 percent.

The drop equates to about a $2 billion loss in market value.

*        *        *

"The recent allegations about Mr. Wynn reflect allegations made in court hearings by Mr. Wynn's ex-wife, Elaine Wynn, in her legal battle with him and the company," the company said in an emailed release. "It is clear that Mr. Wynn's ex-wife has sought to use a negative public relations campaign to achieve what she has been unable to do in the courtroom: tarnish the reputation of Mr. Wynn in an attempt to pressure a revised divorce settlement from him."

*        *        *

But in court documents filed with the Nevada Supreme Court, her lawyers said she learned of one incident of alleged sexual misconduct with an employee as she was preparing for divorce proceedings with her husband in 2009.

The high-powered couple divorced in 2010.

In the redacted document, her lawyers said Elaine Wynn discovered that her husband "had paid millions of dollars to settle a Wynn Resorts employee's allegations of personal misconduct by Mr. Wynn."

Elaine Wynn spoke with two company officials who had knowledge of the allegations and shared information about the conversations with her divorce lawyer, the court papers said.

*        *        *

UltraViolet, an online advocacy group of more than 1 million women and men who want to expose sexism in the public sector, private sector and the media, was among the first to call for Wynn's ouster as company CEO and as finance chair of the Republican National Committee.

"Steve Wynn needs to go," said Nita Chaudhary, co-founder of UltraViolet. "He is a predator of the worst kind who used his position of power to sexually coerce his female employees."

Chaudhary called on the Wynn board of directors to remove Wynn immediately.

"The board of Wynn Resorts must prove that it stands against sexual assault and with survivors and take immediate action to remove Steve Wynn from the company," Chaudhary said. "The Republican National Committee, where Wynn serves as finance chair, must also immediately cut ties with Wynn."

\*　　\*　　\*

Friday's report could have implications for Wynn's $2.4 billion Wynn Boston Harbor casino project in Everett, Massachusetts, set to open in May or June 2019.

Elaine Driscoll, spokeswoman for the Massachusetts Gaming Commission, said in a statement that the regulatory agency "is now aware of and is taking very seriously the troubling allegations detailed in the Wall Street Journal article."

The "suitability and integrity of our gaming licensees is of the utmost importance," Driscoll said, adding that the commission's "Investigations and Enforcement Bureau will conduct a regulatory review of this matter to determine the appropriate next steps."

In Nevada, the state Gaming Control Board is empowered to investigate the suitability of licensees to conduct business in the gaming industry.

"We're aware of the situation and we're reviewing the information," said Becky Harris, the Control Board's newly appointed chairwoman.

86.     Similarly, on January 28, 2018, *Bloomberg* published an article entitled "Harassment Claims Add to History of Issues With Wynn Board," stating:

Long before allegations of serial sexual harassment against billionaire Steve Wynn reverberated from Las Vegas to Washington and Asia, the board of casino operator Wynn Resorts Ltd. had come under fire for weak corporate governance and deference to its founder and chairman.

The board, which oversees an $18.5 billion company with casinos in Las Vegas and the Chinese territory of Macau, has been criticized for overpaying Wynn and other executives while allowing perks such as corporate jets and a land deal between the company and its founder. Wynn shares sank as much as 7.3 percent to $167.06 Monday after a 10 percent decline on Friday.

"A board's governance committee, auditing committee should have been looking at him," said Jeffrey Sonnenfeld, senior associate dean for leadership studies at the Yale School of Management. "If they didn't know this, how come they didn't?"

\*　　\*　　\*

Even with Wynn's denial, the effect from the news was immediate: The share declines over the past two trading days have wiped out about $3.4 billion in market value for the casino operator. Macau's government talked with local Wynn management to seek information, and its Gaming Inspection and Coordination Bureau stressed the importance in a statement of major shareholders, directors and key employees of casino operators meeting suitable qualifications.

*     *     *

**Governance Issues**

Yet many of the same practices continue at his new company, Wynn Resorts, which went public in 2002. Institutional Shareholder Services Inc., the proxy advisory firm, last year gave Wynn Resorts its worst ranking for governance risk. In 2013, ISS notes, the company allowed Wynn to purchase any of the company's aircraft in exchange for giving up an option to buy 2 acres of land on Wynn Resorts' golf course. The company also leases Steve Wynn's personal art for $1 a year, while picking up the cost of insurance, security and taxes.

"CEO pay has increased significantly, driven by large payouts under the annual incentive program and despite long-term underperformance," ISS wrote in its report ahead of last year's annual meeting. In 2015 and 2016, it recommended withholding votes to re-elect members of the board's compensation committee, though it also advised voting for Wynn.

Glass Lewis & Co., another advisory firm, also recommended that shareholders vote against the company's compensation package, citing "poor overall design" and "performance disconnect."

Through Jan. 25, the day before the reports surfaced, Wynn Resorts shares had risen 62 percent in five years, trailing an 89 percent gain in the Standard & Poor's 500 stock index. They had a strong year in 2017, rising 95 percent, while Wynn Macau Ltd. doubled. The Macau unit fell 6.5 percent to HK$28.05 Monday in Hong Kong.

**Board Composition**

The 10-member Wynn board includes Clark Randt, who received a $600,000 consulting agreement in 2015 before his appointment to the board, and J. Edward Virtue, who managed money for the Wynn family prior to 2012, Glass Lewis noted.

The Wynn board is older but has shorter tenure than the average board, according to a comparison with data from executive recruiter Spencer Stuart. The average age of a director in the S&P 500 is 63, compared with 69 for Wynn directors as reported in the most recent proxy filing. The tenure for those directors was about 6.7 years, less than the 8.2-year average for S&P 500 companies.

Now that board has to decide what to do about the allegations against its founder.

Shareholder Richard "Trip" Miller, of Gullane Capital Partners in Memphis, Tennessee, said the board should hire an independent authority to investigate. Nita Chaudhary, of women's rights organization UltraViolet, called for Wynn to be fired. Gaming regulators in Nevada and Massachusetts, where Wynn is building a $2.4 billion property on Boston Harbor, are also looking into the accusations.

**'Cut and Dry'**

If the company has a harassment policy, the founder should be dealt with like anyone else, said Charles Elson, director of the John L. Weinberg Center for Corporate Governance at the University of Delaware.

"Cozy or not, directors have a fiduciary obligation," Elson said. "They are in a very tough spot. But from a governance standpoint, it's pretty cut and dry: They have to do their job."

Patricia Mulroy, the former general manager of the Southern Nevada Water Authority, is Wynn's sole female board member. That compares with the average of a 22 percent female board, as compiled by Spencer Stuart. Mulroy, who is on the board's governance committee, on Friday was named as chair of the special committee investigating the allegations. The committee has started working and will be assisted by independent outside counsel, Wynn Resorts said in an emailed statement.

The Wynn situation is a classic argument for greater gender diversity in business, said Steve Nilsen, an Atlanta-based recruiter for executive search firm Boyden. Only 2 of 13 senior executives are women, Nilsen said, based on his analysis of company reports.

**Gender Diversity**

"You have to imagine that if there was greater gender diversity, there would be a lower threshold for this kind of behavior if it ever came to the board's attention," Nilsen said.

Boards are already more responsible than in the past for ensuring the fiduciary propriety of the company. And with growing evidence that diversity is good for the bottom line, the recent spate of sexual harassment incidents is an argument for requiring board oversight of ethics and behavior, he said.

Corporations may have to ask senior leaders to sign statements that they have not and will not conduct themselves, especially sexually, in a manner that jeopardize the company brand or financial health.

"If not knowing about financial wrongdoing is no longer acceptable, why would not knowing about these sorts of things be acceptable?" he said

87.     Further, on January 29, 2018, *Fortune* published a report entitled "Wynn Resorts Loses $3.5 Billion After Sexual Harassment Allegations Surface About Steve Wynn," stating:

Call it the cost of sexual harassment allegations in the age of the MeToo movement.

Fallout from sexual misconduct accusations against casino mogul Steve Wynn continued Monday, with shares of his company Wynn Resorts falling another 9%. In total, Wynn Resorts has shed about $3.5 billion in value since the *Wall Street Journal* published a story on Friday detailing dozens of misconduct allegations against Wynn. Wynn Resorts is now valued at $17 billion.

\*       \*       \*

But the pain isn't abating for shareholders. The casino industry is sensitive, with moral clauses often attached to gaming licenses – fanning worries about how directly the allegations could impact operations.

And it's the region of Macau that has investors most concerned. Macau accounts for the majority of Wynn's business. On Monday, *Bloomberg* reported that Macau's Gaming Inspection and Coordination Bureau is now talking with Wynn, which could complicate the company's plans to continue expanding in the region.

The gaming commissions of Nevada and Massachusetts have also said that they are reviewing Wynn's licenses.

Wynn is a pillar of his eponymous company, analysts say.

"A scenario where (Wynn resorts) doesn't have Steve as a CEO is not good for the company," wrote J.P. Morgan analyst Joseph Greff in a note Sunday. "We also have always held the belief that Steve Wynn, given his long history of creating shareholder value going back to his Mirage Resorts days, has received a premium multiple (on the stock) for his hands-on involvement."

88.     Further still, on January 29, 2018, *Barron's* published an article entitled "Wynn Keeps Sinking After Sexual Harassment Allegations and Analysts See More Pain to Come," stating:

We've warned that sexual harassment is becoming a serious investment risk and Wynn Resorts' stock is just the latest example.

While there are no "Sell" ratings on Wynn Resorts stock yet, a bearish tone is beginning to emerge in some recent notes. Analysts at Nomura, JPMorgan, and UBS

argued that the Wynn Resorts' risk/reward profile does not appear favorable for investors even at the current price, with UBS cutting its rating to Neutral from Buy.

Best-case scenario: Mr. Wynn is exonerated and the stock recovers the $20 lost on Friday, wrote Harry Curtis, a gaming and lodging analyst at Nomura Instinct, although he calls this scenario the "least likely." Curtis contends that there are too many scenarios to consider and model, but breaks out the most obvious ones:

- Regardless of whether Mr. Wynn resigns or is suspended pending further investigation, the Massachusetts Gaming Commission could force a sale of its license for the Wynn Boston Harbor resort, which is set to open next year. In that case, Wynn Resorts' stock could take a $15-per-share hit.

- If Wynn Resorts' Macau assets take a valuation hit because of an investigation there and/or the company is forced to sell down its majority stake of 72% down to less than 50%, Wynn Resorts' stock could decline by $30-to-$35.

- If Las Vegas revenues take a hit as group bookings and occupancy falls, earnings before interest, taxes, depreciation, and amortization or Ebitda could get cut by $50 million or $5-per-share. If a "fire-sale" occurs at around 10 times forward Ebitda, the stock also takes a $5-per-share hit.

Don't expect the drama to end anytime soon. "Given the quantum of allegations made in the WSJ article, but only a handful that were referred to with specificity in the article, so there could be additional new reports of similar allegations. This can't be helpful for the stock," wrote Joseph Greff, a JPMorgan gaming and lodging analyst. Wynn Resorts without Mr. Wynn is not great, said Greff, and he noted that the firm has long believed that the company "possesses the single largest individual CEO dependency" of any of the other 30 gaming and lodging companies he covers – Las Vegas Sands (LVS) and Sheldon Adelson, perhaps, being the exception. A favorable risk-reward situation for investors would be somewhere in the $150-per-share range, suggesting more pain from here, based on Greff's estimates.

*     *     *

All in all, it might be time for investors to walk out of this casino.

89.     Additionally, on February 9, 2018, *Forbes* published an article attempting to assess the impact of defendant Steve Wynn's resignation. The article, entitled "What Steve Wynn's Resignation Means For Wynn Macau, Wynn Resorts," stated, in relevant part, as follows:

**Uncertainties remain**

Morgan Stanley Asia Pacific's Praveen Choudhary warns there's another shoe to drop. "Some investors might consider the resignation of Steve Wynn as the removal of an overhang on the stock, but we think that many uncertainties remain around who will be the controlling shareholders in future (Mr. Wynn's ex-wife, Elaine Wynn, major shareholder Kazuo Okada, or a new shareholder), if Mr. Wynn decides to sell off his stake," Choudhary, New York-based analyst Thomas Allen and research associate Jeremy An write. That could make Wynn Resorts a takeover target

Elaine Wynn, twice married to and divorced from Wynn, holds 9% of company shares. Their (second) divorce agreement prohibits her from selling the shares or voting them independently. She is suing for full control of the shares, and a trial is due to begin in April.

Okada, the Japanese pachinko magnate and ousted Wynn vice chairman, had his nearly 20% stake in Wynn Resorts forcibly redeemed at a 30% discount in 2012 through what amounted to a corporate kangaroo court. Wynn's board declared Okada's Manila casino, which opened at the end of 2016, a threat to Wynn Macau's business and Okada a threat to all Wynn licenses after an internal investigation questioned $110,000 in hospitality grants to Philippine officials at Wynn properties that were not flagged at the time. Okada's lawsuit to recover his shares is also set for trial in April.

Unless Wynn's shareholding is reduced from its current 12% to less than 5%, Morgan Stanley suggests, "gaming Control Boards would likely continue to scrutinize his involvement with the company." Wynn has licenses in Nevada and Massachusetts, where it is building $2.4 billion Wynn Boston Harbor, and authorities in both states began investigating the company following the allegations.

The outcome of those two trials, and whether gaming regulators treat Wynn as harshly as they treated Okada, will determine the company's future. The founder's resignation leaves corporate Wynn with stability, but little certainty. As long as he remains the company's largest shareholder, with a reminder of that posted on every hotel, he's an issue for Wynn Resorts.

90.     Thus, for at least the foreseeable future, Wynn will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the public, such that Wynn's ability to raise equity capital or debt on favorable terms in the future is now impaired.

91.     In addition, defendant Steve Wynn's improprieties and the Board's conduct in relation to them have exposed Wynn to investigations by gaming regulators in Nevada, Massachusetts and Macau that could result in fines, penalties and even gaming license revocation for Wynn:

- Nevada gaming regulators commenced a formal investigation into Steve Wynn's improprieties on January 30, 2018.  Regulation 5, a chapter in Nevada casino law, requires that gaming establishments are to operate in a "manner suitable to protect the public health, safety, morals, good order and general welfare" of state inhabitants. According to A.G. Burnett, former chairman of the Nevada Gaming Control Board, "Nevada regulators have a broad range of options when it comes to potential disciplining of a licensee, . . . includ[ing] things like complaints, fines, and even potentially revocation."

- On January 29, 2018, gaming regulators in Massachusetts, where Wynn received a 15-year gaming license in September 2014 and is constructing a $2.4 billion resort casino at Boston Harbor set to open in June 2019, similarly launched an "aggressive" investigation into Steve Wynn's improprieties. Massachusetts state law, under which Wynn received its gaming license, requires the Massachusetts Gaming Commission to consider the "integrity, honesty, good character and reputation of the applicant" when considering bids.  State law further requires that licensees "shall have a continuing duty to maintain their integrity and financial stability" and provides that a casino license is a "revocable privilege."  According to Elaine Driscoll, a state gambling commission spokeswoman, Steve Wynn's improprieties, including the 2005 settlement, were not reported by Wynn during the application process. *The Las Vegas Review-Journal* reported that lawyers from Wynn confirmed that the settlement "was not disclosed to investigators on advice of counsel." As a result, the Massachusetts Gaming Commission has reopened its prior determination that Wynn met its suitability requirements and may levy fines against the Company, place conditions on its license or revoke it entirely.  The Boston Harbor project was expected to initially generate $252 million in annual earnings for Wynn, equal to 9% of earnings from the Company's entire casino portfolio.  The Company has already incurred over $1.13 billion in costs associated with constructing the project.

- Government representatives in Macau, through Macau's Gaming Inspection and Coordination Bureau, have requested "detailed clarifications" of ongoing investigations into Steve Wynn's improprieties.  If an extension of Wynn's concession to operate in Macau is not obtained upon its expiration in 2022, revenues from Wynn's Macau gaming operations will end.

92.     Further, as a direct and proximate result of defendants' misconduct, Wynn has expended and will continue to expend significant sums of money. These expenditures include, but are not limited to:

- costs incurred from the loss of the Company's customers' trust and confidence in Wynn;

- costs incurred from the compensation and benefits paid to the defendants who breached their fiduciary duties to the Company; and

- anticipated costs associated with implementing remedial measures to enhance Wynn's legal compliance.

93.     Further still, Wynn's business, brand, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired. Wynn will be harmed in its ability to conduct business both domestically and internationally, and will have great difficulty obtaining future gaming licenses and license renewals and attracting reputable business partners. In sum, defendants' fiduciary failures have exposed, and will continue to expose, Wynn to massive actual losses and risks of loss, for which they are liable.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff incorporates ¶¶1-93.

95.     Plaintiff brings this action derivatively on behalf of Wynn to redress injuries suffered, and to be suffered, by Wynn as a result of defendants' breaches of fiduciary duty, corporate waste and unjust enrichment. Plaintiff will adequately and fairly represent the interests of Wynn in enforcing and prosecuting these derivative claims.

96.     The Wynn Board of Directors has eight members: defendants Virtue, Randt, Miller, Wayson, Hagenbuch, Johnson, Mulroy and Shoemaker (together, the "Board"). Based on the particularized facts set forth in this complaint, a pre-suit demand on the Board is legally excused for several reasons.

- 55 -

97.     First, a pre-suit demand is also excused as to the entire Board because every member

of the Board is beholden to defendant Steve Wynn for their nomination and election to the Board.

They are also his long-time business allies and partners, and close friends. As such, the entire Board

is dependent in significant part on defendant Steve Wynn for their seats on the Board, and would be

expelled from their positions of power and prestige at Wynn, and the perquisites derived therefrom,

for bringing the derivative claims against defendant Steve Wynn and/or any of his closest allies.

Accordingly, the Board is disabled from fairly and objectively considering a pre-suit demand to

bring, let alone vigorously prosecute, the derivative claims asserted against themselves and

defendant Steve Wynn in this action.

98.     Second, a pre-suit demand is excused as a matter of law because the entire Board is

liable for the damages suffered by Wynn in the wake of the public disclosure of defendant Steve

Wynn's reported sexual harassment. Pursuant to their specific duties as Board members, defendants

Virtue, Randt, Miller, Wayson, Hagenbuch, Johnson, Mulroy and Shoemaker were charged with the

management of the Company and to conduct its business affairs in a lawful and legal manner.

However, by as early as 2009 and by no later than 2015, defendants knew or should have known

about the reportedly "decades-long pattern of sexual misconduct" by Steve Wynn, including one

case that resulted in a $7.5 million settlement. But instead of disclosing this adverse material

information, defendants concealed the existence of the settlement and Steve Wynn's reported

indiscretions from Wynn shareholders and, perhaps, even worse, from the regulators responsible for

licensing the Company's gaming operations. As a result, defendants Virtue, Randt, Miller, Wayson,

Hagenbuch, Johnson, Mulroy and Shoemaker breached their fiduciary duties of care, loyalty and

good faith and may be held liable to Wynn for the resulting damages, injuries and losses. Thus, a

majority of the Board cannot exercise independent objective judgment in deciding whether to bring

this action, and/or whether to vigorously prosecute the claims asserted herein, because they participated in the misconduct particularized herein and may be held liable to Wynn for the resulting damages caused by their fiduciary failures.

99.     Third, a majority of the members of the Board have demonstrated an unwillingness and/or an inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies. Therefore, defendants Virtue, Randt, Miller, Wayson, Hagenbuch, Johnson, Mulroy and Shoemaker are not able to and will not vigorously prosecute any such action.

100.     Fourth, a majority of the Board members have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  Therefore, a demand upon the Board is excused as futile.

101.     Fifth, Wynn has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for Wynn any part of the damages Wynn suffered and will suffer thereby.  In fact, just weeks after announcing the opening of its own investigation, the Board, on February 9, 2018, cancelled its investigation into Steve Wynn's reported sexual harassment and terminated O'Melveny & Myers LLP, the highly regarded national law firm it had hired to conduct the investigation.  *See* Chris Kirkham, et al., *Wynn Resorts Board Cancels Outside Investigation of Steve Wynn's Conduct*, Wall St. J., Feb. 12, 2018.  The

Board reportedly may have recommenced the investigation, but did so by hiring Gibson, Dunn & Crutcher LLP, a law firm with close ties to the Company, with one partner representing Wynn directors and officers in a possibly related matter, and where Wynn's General Counsel, defendant Sinatra, was previously a law partner. *See* Chris Kirkham, et al., *Wynn Resorts Board Hires New Law Firm to Run Investigation of Ex-CEO Steve Wynn*, Wall St. J., Feb. 13, 2018. In addition, Gibson, Dunn & Crutcher LLP has been criticized for running a so-called "paperless" investigation into the "Bridgegate" scandal that ensnared former New Jersey Governor Chris Christie:

> Although [Gibson, Dunn & Crutcher LLP] did not delete or shred documents, the process of overwriting their interview notes and drafts of the summaries had the same effect. This was a clever tactic, but when public investigations are involved, straightforward lawyering is superior to calculated strategy. The taxpayers of the State of New Jersey paid [Gibson, Dunn & Crutcher LLP] millions of dollars to conduct a transparent and thorough investigation. What they got instead was opacity and gamesmanship. They deserve better.

*United States v. Baroni, et al.*, No. 2:15-cr-00193-SDW, slip op. at 7 (D.N.J. Dec. 16, 2015) (footnote omitted).

102.    Sixth, defendant Miller's close relationship with defendant Steve Wynn supports the inference that Steve Wynn has the ability to control Miller. Miller has been a director of Wynn since October 2002. Miller receives a $50,000 annual retainer for his service as the Chairman of Wynn's Gaming Compliance Committee and a $20,000 annual retainer for his service as Wynn's Compliance Director. Miller's nomination to the Board and these committees is likely subject to approval by Steve Wynn.

103.    Seventh, defendant Miller has been a partner in Nevada Rose, LLC since November 2004. Nevada Rose is a parent company to a group of companies engaged in the business of importing and selling rose nectar and related products, including in Macau. Further still, defendant Miller has been a director of International Game Technology ("IGT") since 2000. IGT is a global

- 58 -

gaming company specializing in the design, development, manufacture and marketing of casino games, gaming equipment and systems technology for land-based and online social gaming and wagering markets. IGT competes with Okada's Universal Entertainment. IGT has a long-standing business relationship with Steve Wynn. Steve Wynn has been a friend with ex-IGT CEO Charles Mathewson for over 30 years. Wynn Macau has reported running an IGT casino system.

104.    Eighth, defendant Shoemaker's close relationship with defendant Steve Wynn supports the inference that Steve Wynn can control Shoemaker. Shoemaker has been a Wynn director since December 2002. Moreover, from 1986 to 1994, Shoemaker and Steve Wynn have both served on the University of Pennsylvania Board of Trustees. Both Steve Wynn and Shoemaker are graduates of the University of Pennsylvania.

105.    Ninth, defendant Wayson's close relationship with defendant Steve Wynn supports the inference that Steve Wynn has the ability to control Wayson. Defendant Wayson has been a Wynn director since August 2003. Defendant Wayson served as President and CEO of the Golden Nugget Atlantic City from 1984 to 1987. From 2000 to 2003, Wayson served as a director of MGM Mirage, and from 1987 to 2000, served as a director of Mirage Resorts. Defendant Wayson served in these positions, either working directly for or alongside, Steve Wynn. Moreover, defendant Steve Wynn's father and defendant Wayson's father had a business relationship in the 1950s when they operated a bingo hall together in Wayson's Corner, Maryland.

106.    Plaintiff has not made any demand on shareholders of Wynn to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Wynn is a publicly traded company with more than 102.7 million shares of common stock outstanding and hundreds or thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duties of Care, Loyalty and Good Faith
### Against All Defendants

107.   Plaintiff incorporates ¶¶1-106.

108.   As Wynn officers and directors, defendants Virtue, Randt, Miller, Irani, Wayson, Hagenbuch, Johnson, Mulroy, Shoemaker, Maddox, Sinatra and Steve Wynn owe Wynn fiduciary duties of care, loyalty and good faith to direct the operations of the Company in accordance with the laws applicable to its business, including the anti-discrimination and sexual harassment laws. By as early as 2009 and by no later than 2015, defendants knew or should have known about the reportedly "decades-long pattern of sexual misconduct" by Steve Wynn, including one case that led to a $7.5 million settlement. But instead of disclosing this adverse material information, defendants concealed the existence of the settlement and Steve Wynn's reported indiscretions from Wynn shareholders and, perhaps even worse, from the regulators responsible for licensing the Company's gaming operations. As a result, defendants Virtue, Randt, Miller, Irani, Wayson, Hagenbuch, Johnson, Mulroy, Shoemaker, Maddox, Sinatra and Steve Wynn breached their fiduciary duties of care, loyalty and good faith.

109.   As a direct and proximate result of defendants' breaches of fiduciary duties alleged herein, Wynn has sustained significant damages.

110.   Plaintiff, on behalf of Wynn, has no adequate remedy at law.

## COUNT II

### For Corporate Waste Against All Defendants

111.   Plaintiff incorporates ¶¶1-106.

112.   By their wrongful acts and omissions, defendants Virtue, Randt, Miller, Irani, Wayson, Hagenbuch, Johnson, Mulroy, Shoemaker, Maddox, Sinatra and Steve Wynn wasted Wynn's valuable corporate assets by, among other things, causing the Company to pay improper compensation, including salaries, bonuses, fees, stock awards and other incentive-based compensation and benefits to themselves and other Wynn insiders who breached their fiduciary duties owed to Wynn.   Wynn received no benefit from these improper payments.   As a result, defendants damaged Wynn and are liable to the Company for corporate waste.

113.   Plaintiff, on behalf of Wynn, has no adequate remedy at law.

## COUNT III

### For Unjust Enrichment Against All Defendants

114.   Plaintiff incorporates ¶¶1-106.

115.   By their wrongful acts and omissions, Virtue, Randt, Miller, Irani, Wayson, Hagenbuch, Johnson, Mulroy, Shoemaker, Maddox, Sinatra and Steve Wynn were unjustly enriched at the expense of and to the detriment of Wynn.

116.   All the payments and benefits provided to defendants were at the expense of Wynn. The Company received no benefit from these payments.

117.   Plaintiff, on behalf of Wynn, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

118.   Plaintiff, on behalf of Wynn, has no adequate remedy at law.

## COUNT IV

### For Violations of §14(a) of the Exchange Act
### Against All Defendants

119.    Plaintiff incorporates ¶¶1-106.

120.    Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Proxy Statements violated §14(a) and Rule 14a-9 because they omitted: (i) adverse material information about defendant Steve Wynn's reported pattern of sexual harassment of Wynn's female employees, including one case that led to a $7.5 million settlement; and (ii) defendants' non-disclosure of such adverse material information to Wynn's gaming industry regulators, thereby putting the Company's gaming approvals and licenses in potential jeopardy.

121.    Additionally, even though the Proxy Statements sought shareholder votes for, among other things, the election of directors, they failed to disclose the material risks of loss that the Company faced as a result of defendant Steve Wynn's reported pattern of sexual harassment, the $7.5 million settlement with a female Wynn employee and/or defendants' handling and non-disclosure of adverse material information regarding Steve Wynn's indiscretions to Wynn shareholders and regulators alike.

122.    In the exercise of reasonable care, defendants should have known that the statements contained in the Proxy Statements were materially false and misleading and/or that the Proxy Statements omitted material information. Wynn has been damaged as a result of defendants' material misrepresentations and omissions in the Proxy Statements.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in Wynn's favor against all defendants as follows:

A.     Declaring that plaintiff may maintain this action on behalf of Wynn and that plaintiff is an adequate representative of the Company;

B.     Declaring that defendants have breached and/or aided and abetted breaches of their fiduciary duties of care, good faith and loyalty owed to Wynn;

C.     Requiring that defendant Wynn's separation from Wynn be deemed "for cause," given the damages suffered by the Company due to his reported pattern of sexual harassment of female Wynn employees;

D.     Determining and awarding to Wynn the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

E.     Determining and awarding to Wynn exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.     Awarding Wynn restitution from defendants, and each of them;

G.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

H.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: March 9, 2018

THE O'MARA LAW FIRM, P.C.
DAVID C. O'MARA (Nevada Bar No. 8599)

_____
DAVID C. O'MARA

311 East Liberty Street
Reno, NV 89501
Telephone: 775/323-1321
775/323-4082 (fax)
david@omaralaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff

## VERIFICATION

I, John J. Riley, II, as trustee of the City of Dearborn Heights Act 345 Police & Fire Retirement System ("City of Dearborn Heights"), acting on behalf of and with the consent of City of Dearborn Heights, hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Corporate Waste, Unjust Enrichment and Violations of the Federal Securities Laws that the foregoing is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

City of Dearborn Heights Act 345 Police & Fire Retirement System

DATED: _3/8/2018_

_____
John J. Riley, II